## DR. P. N. OGLE v. R. F. NOE.

Eastern Section. September 3, 1927.

Petition for Certiorari denied by Supreme Court, January 28, 1928.

1. **Physicians and surgeons. Physicians and dentists are not insurers of the results of their work.**

   Physicians and dentists are not insurers of results where they possess and employ the requisite degree of knowledge, ability and skill as thus defined, and a physician or dentist who does possess and supply the requisite degree of knowledge, ability and skill as thus defined is not liable for the resulting consequences be they what they may.

2. **Physicians and surgeons. Negligence. Negligence of a physician defined.**

   Negligence of a physician consists in doing something which he should not have done in the treatment of a case, or in omitting to do something he should have done.

3. **Physicians and surgeons. Negligence. Evidence. Broken jaw may be considered with other evidence to show negligence.**

   In an action against a dentist for negligently breaking plaintiff's jaw, held that the broken jaw itself would not establish negligence, but might be considered with other facts and circumstances to prove negligence.

4. **Physicians and surgeons. Negligence. Evidence. Evidence in instant case held sufficient to show negligence on the part of a dentist.**

   Where the evidence showed that plaintiff was sent to defendant who purported to be an expert in extracting teeth, and plaintiff's evidence showed that defendant did not follow the method prescribed by him or by other dentists in extracting a tooth like the one extracted, held that there was sufficient evidence to sustain the verdict of the jury holding defendant guilty of negligence.

5. **Damages. Two thousand dollars held not excessive for a broken jaw.**

   In an action to recover damages for a jaw alleged to have been broken by defendant's negligence in extracting a tooth held that two thousand dollars was not an excessive verdict.

Appeal from Circuit Court, Knox County; Hon. A. C. Grimm, Judge.

Affirmed.

W. B. Lee and J. M. Meek, of Knoxville, for appellant.

W. N. Hickey, of Morristown, and Frank Montgomery, of Knoxville, for appellee.

SNODGRASS, J. This is an action for damages alleged to have been sustained in the pulling of a tooth, whereby it was claimed the plaintiff's jawbone was broken, causing not only great pain and suffering, but resulting in permanent injuries. The action is against Dr. P. N. Ogle, a specialist in tooth extraction, residing in the City of Knoxville. The defendant in error, who was the plaintiff below, is a farmer, residing not far from Morristown, Tennessee. He had stomach trouble, for which he had been treated for several years. He decided to have his teeth X-rayed, and on March 9, 1923 had this done by Dr. Lewis, a dentist at Morristown. It was then discovered that his jawbone was badly necrossed, the doctor stating that most of the bone was gone except the alveolar process holding the two molar and the second bicuspid teeth. This was in the lower left jaw. Dr. Lewis extracted or pulled the second bicuspid and the first molar. He decided that, owing to the weakened condition of the bone, it was not safe for him to undertake to pull the other tooth, and advised application to more expert assistance or of better facilities. He was afraid of breaking the jawbone.

Plaintiff on the 12th day of March, 1923 sought this assistance in Knoxville, Tennessee, and applied to Dr. P. N. Ogle, who represented himself as such expert, or with capacity to perform the work. Upon being informed why Dr. Lewis had declined to undertake the pulling of the tooth made certain X-ray photographs himself, and proceeded to extract the tooth. After such operation he wired up a confessedly badly broken jaw, and plaintiff returned to Morristown with the following letter written by Dr. Ogle to Dr. Lewis:

"March 12, 1923.

"Dr. Lewis,

"Morristown, Tennessee

"Dear Doctor:-

"The case of Reuben Noe, I find the mandible fractured and I removed the second molar and I wired his tooth together. You can look after it for him, have him visit your office every three or four days and irrigate his mouth well and instruct him how to wash his mouth using any antiseptic mouth wash. Doctor see that these wires are kept in place. If they come loose fix them back. If you need my services let me know.

"Yours truly,

"P. N. Ogle."

The wiring operation consisted of securing an allignment of the upper and lower jaw, wiring the upper and lower teeth together with a silver wire, thus securing an opportunity for the healing of the broken jawbone and the restoration, as far as possible, of its original condition. He was told that it would have to remain in that condition for six or seven weeks. His financial condition was not such as to enable him to make better arrangements or a more satisfactory treatment, if indeed such had been possible. He suffered this enforced inconvenience with respect to washing his mouth or eating, being fed for a long time upon liquid food supped into his mouth from a spoon; during which time there was much actual physical suffering, and there has finally resulted only a limited power to masticate his food, necessitating the guarding against biting hard upon any solid, resisting substance and a deadened condition in the left side of his lower face, which it is claimed has been occasioned by the suffering or injury to some facial nerve at the time of the operation of removing the tooth, which he alleged was finally accomplished by the sawing of the tooth from its connections.

There were two counts to the declaration. In the first it is substantially claimed that Dr. Ogle broke the jawbone by negligently pulling on the tooth, when, under the circumstances, he should have quartered or taken it out in a way less liable to that result. In the second count it is averred that the jawbone was broken, and that the doctor, knowing of its condition, negligently pulled on the tooth, accentuating the injuries needlessly, when the tooth under the circumstances should have been quartered or taken out in a way less liable to have eventuated in the conditions that followed. In other words, that Dr. Ogle was negligent in the performance of the operation in any event, which it is claimed was the proximate cause of the injuries. The declaration laid the damages in the sum of $10,000.

There was a plea of not guilty, upon which the cause has been twice heard. At the first trial there was a verdict and judgment in favor of the plaintiff and against the defendant in the sum of $2,000. This was set aside, however, on motion for a new trial interposed by the defendant, upon the ground that the evidence preponderated against the verdict. In this motion for a new trial, however, it had been insisted that the court should have directed a verdict, because it claimed that there was no evidence upon which the jury would be authorized to find a liability, and a wayside bill of exceptions was filed preserving this question.

Upon the second trial had before the court and jury there was the same result, a verdict for $2,000 being returned in favor of the plaintiff, and this notwithstanding the motion for a new trial was permitted to stand and said motion overruled. The defendant appealed

to this court and has assigned errors, both as to the first and second trial. The only assignment necessary to consider as to the first trial is, as to whether or not the court should have directed a verdict. As to the second trial, the errors assigned are as follows:

"1. The court erred in overruling the defendant's motion for a directed verdict in his favor, made at the conclusion of the plaintiff's testimony.

"2. The court erred in overruling the defendant's motion for a directed verdict in his favor made at the conclusion of all the evidence in the case.

"3. The court erred in overruling defendant's motion for a new trial because there is no evidence to sustain a verdict in favor of the plaintiff.

"4. The court erred in overruling defendant's motion for a new trial because of the court's error in instructing the jury after charging that the burden of proof was on the plaintiff, who must prove the case substantially as averred in the declaration by a preponderance of the evidence, as follows: 'Provided, however, that if knowledge touching any competent and pertinent fact or facts in this case is peculiarly within the knowledge and control of the defendant, then the burden of proof with reference thereto rests upon the defendant.'

"5. Because the verdict is so excessive that it evidences passion, prejudice and caprice upon the part of the jury."

Our investigation of the record leads us to the conclusion that the judgment must be affirmed, notwithstanding plaintiff in error insists that to do so "will seal the doom of physicians and surgeons in Tennessee." Let us hope, if we are not in error in discharging in this affirmance what we conceive to be our duty under the finding of the jury and the law of the case, that it will have no such dire result; but rather that it may tend to conserve, protect and guard a useful profession in the discharge of the delicate duties which must perforce be intrusted to their special and expert qualifications, by not only requiring that such qualifications be possessed when professed, but that they are carefully and skilfully exercised when employed for the alleviation of suffering. There is no trouble about ample protection for the honest and capable surgeon or dentist who fails after the application of both learning and skill honestly though even mistakenly employed, but neither the expert nor the charlatan can or should escape the consequences of negligence proximately occasioning injury. As said by the learned trial judge in his charge to the jury in this cause:

"It was the duty of defendant to possess and employ that degree of knowledge, ability and skill ordinarily possessed and employed by experts in his line of practice in the same general locality, having due regard for the state of the art at that time,

and if the defendant did possess or did employ the requisite degree of knowledge, ability and skill as thus defined, the defendant is not liable no matter what the result.

"Physicians and dentists are not insurers of results where they possess and employ the requisite degree of knowledge, ability and skill as thus defined, and a physician or dentist who does possess and supply the requisite degree of knowledge, ability and skill as thus defined is not liable for the resulting consequences be they what they may."

The reasons for this rule, as shown by counsel in their brief, is well stated by Judge Taft in Irwin v. Goods, 78 Fed., 442, as "few would be courageous enough to practice the healing art, for they would have to assume financial responsibility for nearly all the ills the flesh is heir to."

Nevertheless they do have to assume financial responsibility for either a lack of such knowledge, or its negligent or unskillful employment, when injury is the proximate result of either. The reasons therefor, as shown in the brief of the other counsel, is stated by Judge Caruthers in the case of Wood v. Clapp, 4 Sneed, 68—a case against a surgeon for malpractice, as follows:

"There is no profession in which the members should be held more strictly liable for want of proper skill and science and due and faithful attention to their duties than that of medicine. The health and lives of the people are in their hands, and but few are qualified to judge of their pretensions."

There is a wealth of citation in this case, but there is no trouble as to the law. It is in the confinement and application of the law to the facts of this case.

There is a further citation in appellant's brief to the case of Lorenz v. Berthold (Wash.), 147 Pac., which holds that "negligence by a physician consists in doing something which he should not have done in the treatment of a case, or in omitting to do something he should have done," and in that case it was held that "the fact that the injured limb is defective after treatment by a physician is not evidence of negligence, the maxim res ipsa loquitur not applying."

While in this case the broken jaw and its failure to hold perfectly with its attendant deadening of the face may not be evidence of negligence, they do not preclude an inquiry into the cause, as to whether or not the jaw was broken by the defendant, Dr. Ogle, by the negligent pulling on the tooth as insisted in the first count, or as to whether or not the jaw was already broken and the injury he suffered merely accentuated by the negligent pulling on the tooth as insisted in the second count. Appellant we think has taken a too narrow view of the issues in his insistence that the vital question is, "does the mere fact of injury or a bad result, standing alone, furnish evidence from which a jury may infer negligence?" The evidence of negligence in

the proof we think is not confined to that furnished by the injury. There is much more in the record from which negligence can be predicated than this, and in determining this question we cannot take the plaintiff in error's version where it is in conflict as to how the injury occurred as controlling of the results. The question here is, on the insistence that there should have been a directed verdict, and upon the insistence that there is no evidence to support the verdict, is there any evidence in support of either count in the declaration upon which the jury was authorized to predicate the negligence of the defendant as the proximate cause of the injury? In the determination of this question we cannot take the plaintiff in error's statement that he adopted the best and most up-to-date method, that of the elevator process, either in the necessary removal of the tooth from a thin and weakened jawbone, or from a jaw that had been previously broken, because the plaintiff has testified that he did not remove the tooth in any event in that way, but that he took hold of the tooth with his forceps and pulled or yanked him up out of his chair with force, and that the final removal of the tooth was by the aid of a saw. The tooth itself, filed as exhibit in the cause, has a smooth diagonal cut or surface near the extremity of its roots, indicating that the ends of the roots might have been severed in such way. Plaintiff in error insists that he did not pull the tooth in this way, (thus inferentially conceding that it was not the proper way) but that he only took hold of it with his forceps as an incident to his examination to see as to its condition. He insists that he cut the tooth with an elevator, which he describes as "an instrument that you put between the teeth and prize them apart." He said that that was the only way he took the tooth out, and testified that that was the accepted and recognized method by good dentists, and that if there was any better anywhere he did not know it. While the quartering method was known as an expedient where the ordinary method of pulling was not advisable, it was somewhat criticized by plaintiff in error's proof, at least as inferior to the elevator process which the Doctor claims he used, and which in that event we think he was authorized to adopt. Still it is to be observed that it is practically conceded to have been a case not for the strong-arm method usually employed in the ordinary extraction of teeth. Admittedly the quartering method was not used. Admittedly the weakness of the jaw, if it was not broken, was apparent or easily discoverable. Necrosis and abcess were apparent, and so apparent that Dr. Lewis would not undertake to pull it, and was not in position to use any other method for its extraction, and the plaintiff sought this expert in order that such facility might be employed to prevent the breaking of the jawbone. According to the defendant in error he told Dr. Ogle this, and called his attention to the quartering process which was thought

to be one efficacious method. His description of what occurred in Dr. Ogle's office is as follows:

"Q. Now, Mr. Noe, I believe you have stated that you told Dr. Ogle what had occurred at Morristown, now what did he say to you when you told him that you were hunting a specialist in the extraction of teeth? A. Well he told me he was a specialist and that he was the best that there was down there.

"Q. After that what occurred, go ahead? A. Well he says the first thing I will have to do, I will have to make an X-ray of your jaw and see the condition of it and I told him all right and he took me out in a room and made an X-ray and when he made the X-ray he claimed it wasn't good, the first one that he made and he says I will have to make another one, so he made a second X-ray and when he made it and while it was getting all right, where he could see it he blocked the nerve, put two shots of medicine in the jaw, that is what he called blocking the nerve.

"Q. Injected something in it to kill the feeling? A. Yes sir, I don't know much about what he did and he says, when he come back in from looking at his second X-ray he says that isn't serious at all, he says I will have that out in a few minutes, he says your Morristown man just lost his nerve.

"Q. Well go ahead. A. So he says he just lost his nerve, well I didn't know, I had done told him that I wanted him to quarter it up and take it out in pieces and I thought that was the way he would do it but he had taken up his forceps and put them on it and put his arm over me and made a surge at me that brought me clear up out of the chair, pulled it, and me hollering.

"Q. Did he get the tooth out? A. No sir, it did not come out and he had to let it go and when he let it go he told the lady to hand him some medicine, I had about fainted you know and he put that to my nose and told her to raise the window and she did and then he began to load his needle to give it another shot of medicine and by that time two men came in and says what is the trouble in here, I heard someone hollering and he says I thought—

"Q. (Interrupting) Was that in the presence of Dr. Ogle? A. Yes sir, he said I thought I had his jaw nummer than I did and I made a pull on it and it hurt him and he says I will ease it in a few minutes and after he put a shot of medicine in it— it had hurt so bad it liked to have killed me and after he put a shot of medicine in it it got back easy again and he said to one of those men there with him, says I want you to help me get this tooth out and he gave him an instrument and held my face

back out of the way and he sawed it out and while he was sawing on that tooth he says—this man that was helping him says, 'look out,' says 'you will cut the nerve and ruin him,' and of course there wasn't nothing said as to whether he cut it or didn't cut it, I couldn't have told, he could have cut my jaw it was so numb but this swelling has been in my jaw ever since.

"Q. Did they get the tooth out? A. Yes sir, sawed it out and when he sawed it out, he just laid his instruments over on a little table and he taken my chin that way and jaw and began to work it and he says, 'Noe, I am sorry to tell you,' says 'your jawbone is right square in two' and says 'your Morristown men done it.' And I says 'Doctor, I believe my jaw come in two when you made that surge there and tried to pull it,' 'Oh no,' he said, 'I couldn't possibly have done it,' I just twisted the jaw that way, and that is about all he said about that.

"Q. Have you the tooth there? A. Yes sir.

"Q. I mean the tooth that— A. That he taken out, yes sir I have it.

"Q. You have had it in your possession all of the time. A. Yes sir he gave it to me.

"Mr. Hickey: We want to offer this in evidence. The Witness: There is a catch on it where he sawed it off."

Without undertaking to discuss the evidence in detail we think it is such as that the jury were authorized to conclude that the tooth was actually pulled and extracted in this way, though it was the very way in which Dr. Lewis had declined to extract it for fear of breaking the bone in two. Plaintiff had come to have it extracted in a different way. We think the jury were authorized to conclude that the bone was not broken at the time he consulted Dr. Ogle, and that Dr. Ogle's examination led him to conclude he could pull it like the others had been pulled, that Dr. Lewis had just lost his nerve, and that it was not worth while to resort to other methods, but undertook to pull it in this most convenient method and broke his jawbone; that the negligence consisted in not adopting other means, which were at hand for the purpose of extracting the tooth, and which the Doctor claims he did adopt for the purpose of extracting the tooth from a broken jaw; that they were authorized to conclude from Dr. Lewis' testimony that there was less dangerous means of getting rid of this tooth under the circumstances, which might have saved the jaw from being broken; and from the defendant in error's testimony showing that the Doctor did not adopt such means, but notwithstanding he was aware of the danger, he negligently minimized it and used a more dangerous method of extraction, when a less dangerous one was at hand, or should have been available to an expert holding himself out as such. This was not merely error of judgment.

This was negligence, or what they were authorized under the proof to regard as negligence.

There was evidence therefore on both trials upon which the cause should have gone to the jury, and there is evidence to support their verdict. Nor do we think when thus supported the verdict is excessive. It is insisted, however, that the case should have been reversed and remanded for a new trial, because it is alleged the court was in error in submitting to the jury the instructions set out in the fourth assignment. We think the clause "provided, however, that if knowledge touching any competent and pertinent fact or facts in this case is peculiarly within the knowledge and control of the defendant, then the burden of proof with reference thereto rests upon the defendant" is a pure abstraction, having, if error, not sufficient clearness to be misleading or to detract from the merits of the sound principle which had just been announced, and to which it was coupled. At best it can only be claimed that the court meant to say, that if there was any fact or facts in the case peculiarly within the knowledge and control of the defendant which would have been available to him as an affirmative defense, (like confession and avoidance) the burden of proof would be on him to establish that fact or facts. This does not put the burden of proof as to the whole case on defendant. We do not think it such an error, if error, as affected the merits of the controversy.

The assignments of error are all overruled and the judgment of the lower court affirmed, with costs against appellant and his securities.

Portrum and Thompson, JJ., concur.