JAY ISON, b/n/f Murrell Ison, Plaintiff-in-Error, v.
B. G. McFALL, D.C., Defendant-in-Error.

MURRELL ISON, Plaintiff-in-Error, v. B. G. McFALL,
D.C., Defendant-in-Error.—400 S.W.(2d) 243.

Western Section. March 26, 1964.

Certiorari Denied by Supreme Court September 4, 1964.

328

Taylor & Inman, Morristown, for plaintiffs in error.

Sam Jack Anderson, C. Frank Davis, Morristown, for defendant in error.

CARNEY, J. The plaintiff below, Jay Ison, aged 16, by next friend, his father, Murrell Ison, brought suit for damages for malpractice against the defendant, B. G. McFall, Doctor of Chiropractic, of Morristown, Tennessee. Murrell Ison, father of Jay Ison, brought a companion suit for loss of services, medical expenses, etc., arising out of the illness and injuries of his son, Jay Ison.

The plaintiff, Jay Ison, averred that he had become paralyzed from his waist down and therefore totally disabled as a result of chiropractic treatments negligently administered to him by the defendant, Dr. B. G. McFall, on August 11, 1962. Dr. McFall admitted giving the chiropractic treatments; denied that such treatments were negligently given; denied that they were the cause of plaintiff's paralysis and contended that such paralysis was the result of spinal meningitis.

The case was first tried in October, 1963, and resulted in a hung jury. On the second trial there was a verdict for the defendant. After motions for a new trial were overruled the plaintiffs below perfected their appeals in error to this court. No wayside bill of exceptions was preserved and we are not concerned on this appeal with any phase of the first trial.

The plaintiff, Jay Ison, during the months of June and July, 1962, was working in his father's automobile body repair shop in Morristown doing various types of work around the shop including the sanding and masking of automobile bodies preparatory to painting them. Plaintiff testified that he was in good health and that on Monday, July 30, 1962, he, along with some three other employees, attempted to lift an automobile motor and strained his back. After several days he developed a pain in the upper portion of his back. On Monday, August 6,

1962, at the suggestion of his father who had been a patient of the defendant, Dr. McFall, plaintiff, Jay Ison, went to Dr. McFall for examination and treatment. Dr. McFall is 29 years old and has been licensed as a Chiropractor six years. He was graduated from Palmer School of Chiropractic, Davenport, Iowa.

Dr. McFall testified that he was informed by young Ison that he had strained his neck and shoulders while attempting to lift a motor out of a car and was having pain, discomfort and limited motion and movement in his neck; that he, Dr. McFall, examined Ison in the following manner: (1) By palpation which consisted of feeling of the vertebrae with his fingertips; (2) by making three x-ray photographs of the atlas vertebra which is the vertebra immediately under the skull and (3) by the use of a machine called an electrograph.

Dr. McFall explained that the electrograph operates in a manner similar to an electrocardiograph. It registers a reading of heat on a graph. The pickup unit was placed along the neck of the patient and recorded the heat distribution of the spinal nerves from which the doctor determined that if the graph showed a regular and consistent graph reading that the patient was "in pattern"; that the electrograph on young Ison's neck at the atlas vertebra indicated to him that he was in pattern and hence had some pressure on this vertebra.

Upon his examination Dr. McFall determined that young Ison had a subluxation of the atlas and axis vertebrae as well as a strain in the musculature of the upper shoulders immediately below the atlas vertebra. Dr. McFall administered unto young Ison a specific chiropractic adjustment of the atlas vertebra. He explained that this adjustment consisted of placing young

Ison on a "hi-lo table" face downward and applying pressure with his hands to the atlas and axis vertebrae; that the pressure was very light and more or less a massage which was applied mostly on the upper shoulders and the neck. This was for the purpose of relaxing the musculature of the neck and upper shoulders. A hi-lo table is one which the patient walks onto or stands upon after which it is lowered hydraulically with the patient lying in a prone position face down for adjustment of the spine.

After treatment on the hi-lo table young Ison was transferred to what Dr. McFall called a side posture table for a togal recoil adjustment. He explained that both tables have leaves in them which are movable to fit the contour of the patient's spine and they are designed to give under pressure. The adjustment was completed upon young Ison on the side posture table which consisted primarily of an adjustment to his neck.

Plaintiff, Jay Ison, described the adjustment as follows:

"Q. Now, I want you to describe if you will, the best you can, the procedure Dr. McFall used on Monday in treating you, what did he do * * * just tell every thing he did?

"A. He has a thing that measures pressure, a little graph machine he runs up your neck first, and he did that then he took me and put me on a table that stands up and laid it down and pressed the bones in my back and they popped, and then he put me on that table that lays down and the neck of it raises up and he drops it with some kind of a drop lever and popped the bones in my neck.

"Q. Now, Jay, let's go back to this thing, you called it a stand up table?

"A. It stands up and it lets down, too.

"Q. Well, how do you get on the table?

"A. You just walk up to it and put your feet on something down there and you just lay up in it then he lets it down.

"Q. Do you mean the table stands upright?

"A. It stands up at an angle about like that and it lets down something like that.

"Q. Lays down flat?

"A. It lays down the best I remember.

"Q. Now, after it gets down are you lying on your back or on your face?

"A. You are laying face down.

"Q. Now, when you were on that table you said he did something to your back, now, describe in detail what he did?

"A. He went up my back bone mashing the bones and they popped.

"Q. Now what part of his hands would he use in that maneuver?

"A. I don't know what part of his hands, I couldn't see his hands.

"Q. Well, could you feel them on your back?

"A. Yes, I could feel him mashing them.

"Q. And what did you say about something popping?

"A. Yes, he said they would pop.

"Q. Now then, how long did that procedure take would you say?

"A. I'd say about 10 minutes.

"Q. Then I believe you said you got on another piece of equipment he had, is that correct?

"A. Yes.

"Q. All right, describe that?

"A. It's a table that lays flat, it stays flat all the time, and you lay on your side, * * * there's a little lever * * *

"Q. Where's your head when you get on that table?

"A. There's a little pad that raises up, raises up about that high and you put your head on it.

"Q. Then what does he do after you get your head * * *

"A. He puts his hands right in here.

"Q. And then what?

"A. He mashes it and drops that lever at the same time.

"Q. What lever is that?

"A. It's some lever that's on the floor.

"Q. And what happens when he trips the lever?

"A. When he trips the lever that pad falls down real quick.

"Q. And what's the sensation that you have when the thing falls?

"A. Your head just falls down.

"Q. What effect does that have on your head? How does it feel?

"A. Your head just drops * * * I mean * * * him pushing against it here it just drops."

These treatments continued in exactly the same way on Tuesday, Wednesday, Thursday and Friday of the same week. Dr. McFall stated that he made no new x-rays or further examination of young Ison during that week except to use the electrograph. Dr. McFall stated that on Friday young Ison complained to him that he was weak, had not eaten very much and had not had much sleep. Dr. McFall stated the he gave him the same treatment.

On the next day, Saturday morning, very early, Jay Ison's father, Murrell Ison, brought the boy to Dr. McFall reporting that young Ison had grown weaker, had slept none, hadn't eaten anything and was having difficulty in walking. Dr. McFall and Mr. Ison assisted young Ison into the office and onto the hi-lo table. Young Ison told him that he was losing the use of his legs and felt some numbness and tingling in them.

Dr. McFall testified that he took a graph reading on the electrograph which still indicated to him that young Ison was "in pattern" and had pressure on the atlas vertebra; that he applied hot wet towels to young Ison's back and then gave him the regular specific adjustment; that he then repeated the treatment with a second adjustment. After the second adjustment Mr. Ison and Dr. McFall assisted the boy from the chiropractor's office to the Ison automobile. Dr. McFall never did treat young Ison anymore. Dr. McFall stated on cross-examination

that he knew as a chiropractor that such symptoms as losing the use of the legs and the tingling and numbness were indicative of some injury, damage or difficulty in the spinal cord.

Mr. Ison testified that on Saturday after the last treatment he and Dr. McFall helped young Ison to the car and that Dr. McFall suggested that he take young Ison home and put him to bed and that Mr. Ison should go by the drug store and pick up a sleeping tablet or pill; that he, Dr. McFall, would be out of town over the week end but would be available by Sunday night if needed. Mr. Ison testified that he drove the boy home but by the time he got home the boy had lost use of his legs completely and could not get out of the car; that he, Mr. Ison, went in the house and got his pajamas and drove Jay Ison to Takoma Hospital in Greeneville, Tennessee, where he was put under the care of Dr. James Ray McKinney.

After examination Dr. McKinney suggested to Mr. Ison that he take Jay to Kingsport for examination and treatment by Dr. O'Connell, a neurosurgeon. On the next morning, Sunday, Mr. Ison left Takoma Hospital in Greeneville with Jay Ison and entered him in the Holston Valley Community Hospital in Kingsport around 9:00 A.M. Jay remained under treatment of Dr. O'Connell for about three months after which he was transferred to the East Tennessee Children's Hospital in Knoxville, Tennessee, where he was treated by Dr. Neblett.

At the time of the trial young Ison had improved to the extent that he could walk with difficulty by using two steel bars as braces on each side of his legs attached to steel bands around his legs with special locks at the hip, knee and ankle joints and the use of special shoes and crutches. He had almost complete control of his bowel

movements but still had no control whatsoever of his urinary actions.

Mr. Ison testified that he had incurred doctors' and hospital bills at the time of the trial totaling $4,497.88; that he had been in communication with a rehabilitation center in Fisherville, Virginia known as the Woodrow Wilson Rehabilitation Center; and that it was planned to take Jay Ison to this institution for a twelve months period of schooling and medical treatment which would cost approximately $4,000.00.

Dr. P. P. Neblett, M.D., testified that he was the chief orthopedic surgery resident of the East Tennessee Children's Hospital at Knoxville, Tennessee, and that he had treated Jay Ison from the first of January, 1963, to the date of the trial on April 16, 1963; that at the time of the trial he had made about all of the improvement which he, Dr. Neblett, expected him to make; that he doubted he would ever be able to get out of the braces; that Jay had had severe damage to his spinal cord at approximately the level of the fourth thoracic vertebra; that most people have seven cervical and twelve thoracic vertebrae and that the thoracic vertebrae are below the cervical vertebrae.

By hypothetical question the plaintiff attempted to prove by Dr. Neblett that the paralysis sustained by Jay Ison was the direct result of the chiropractic adjustment given him by Dr. McFall. His Honor the Trial Judge was of opinion that since Dr. Neblett professed to have only limited knowledge of the practice of chiropractic, he should sustain the objection to the testimony. After many pages of objections, reframing of the questions, colloquy between the Judge and the lawyers both before and out of the presence of the jury. The record shows that His

Honor the Trial Judge finally with the statement, "I am going to let it go to the jury for whatever it's worth," permitted Dr. Neblett to testify that in his opinion the paralysis of Jay Ison was caused by a hemorrhage of blood in the spinal cord, and that the hemorrhage was caused by trauma which he defined as being an injury which included direct or indirect force. Dr. Neblett was also permitted to explain the various factors on which he ruled out the probability that Jay Ison's paralysis was caused by tumor or infection such as spinal meningitis.

Dr. Frank B. O'Connell, M.D., a neurosurgeon of Kingsport, Tennessee, testified by deposition. He stated that he had read the pre-trial deposition of Dr. McFall and filed it as an exhibit to his deposition. The Trial Court excluded a considerable portion of Dr. O'Connell's evidence upon objection by counsel for defendant. Dr. O'Connell testified that in his opinion Jay Ison had made about all of the recovery from the paralysis he expected him to make and that he had recommended that he be taken to Fisherville, Virginia, for treatment, education and rehabilitation as a paraplegic.

The Trial Judge did permit a hypothetical question to be answered by Dr. O'Connell in which he gave it as his opinion that the chiropractic adjustments given by Dr. McFall to the spinal column of young Ison were the cause of the hemorrhage in the spinal cord. Further, His Honor the Trial Judge permitted to be read to the jury the answer of Dr. O'Connell that the continuation of the manipulative treatments of Jay Ison's back by Dr. McFall on Saturday after being informed by Jay Ison that he was losing the use of his legs and that he had sustained a tingling sensation in his legs under the additional circumstances assumed in the hypothetical question, that

such manipulative treatments were not in keeping with the ordinary accepted standards of care of treatment in any school of medicine in the area.

His Honor the Trial Judge sustained an objection to the statement by Dr. O'Connell that the use of the electrograph by Dr. McFall which measured the heat of the various sections of the human spine to determine whether the spine was "in pattern" was pure charlatanism. We quote from Dr. O'Connell's deposition as follows:

"Q. Doctor, do you have an understanding as to where the field of the practice of chiropractics begins and where it leaves off insofar as the treatment of paralysis in the legs is concerned?

"A. Well, my opinion would be that treatment of the paralysis of the legs has no beginning in that field. * * *

"*MR. ANDERSON*: We object to that, Your Honor please.

"*THE COURT*: Overruled. Let it go to the jury for whatever it's worth.

"A. * * * I don't believe that is a part of that field, properly handled from a medical standpoint.

"Q. Do you have an opinion, Doctor, as to whether one who is licensed solely and alone as a chiropractor would be invading the field of the practice of medicine if he attempted to treat a case of paralysis of the legs?

"*MR. ANDERSON*: Your Honor, we object to that.

"*THE COURT*: Sustained as to that, that is not for the doctor to say.

*"MR. TAYLOR*: May I make an offer of proof, Your Honor?

*"THE COURT*: Yes, let the record show it.

"A. Yes, I think that would be an invasion of the medical field."

Again, we quote from the testimony of Dr. O'Connell as follows:

"Q. Doctor, do you know of any treatments presently available which could better or remedy the paralyzed or paraplegic condition of Mr. Jay Ison?

"A. No, sir, this condition is not helped by surgery and it's a matter of what recovery the spinal cord is able to do by itself, so to speak.

"Q. Doctor, should the condition of the paralysis of the legs and loss of use of the legs, and a tingling sensation in the legs indicate to a practitioner of any school of medicine, or school of physicians, including that of a chiropractor, that there was an involvement of the spine, or was possibly an involvement of the spine?

"A. Yes, sir.

"Q. In your opinion, should a patient who has a loss of the use of the legs or a tingling sensation in the legs be treated by manipulations of the spinal cord, or the spinal column?

"A. No, sir.

*"MR. ANDERSON*: We object to that, Your Honor.

*"THE COURT*: Overruled.

*"MR. ANDERSON*: Reserve exception.

"Q. In your opinion, would that be true of any school of practice including that of the chiropractor?

"A. Yes, sir.

"*MR. TAYLOR*: Now, if Your Honor please, going back to one question which Your Honor overruled for the time being——I believe it was the second offer of proof that I made.

"*THE COURT*: Read the question.

"Q. Doctor, assuming that a patient complained to you about the loss of the use of the legs, and tingling in the legs, what treatment would you, as a physician, give, or what would you as a physician do?

"*THE COURT*: Overruled. Let it go to the jury for whatever it's worth.

"*MR. ANDERSON*: Reserve exception.

"A. Well, of course, these symptoms to me, mean some involvement of the spinal cord, the treatment is to ascertain what is causing it. It usually requires a spinal test and perhaps the myelogram x-ray I previously mentioned, x-rays of the spine as part of the work up, and frequently, depending on the cause, there may be surgery needed as part of the treatment."

Dr. McKinney testified that he was a practicing physician and surgeon in Greeneville, Tennessee, and that he saw Jay Ison on Saturday, August 11, 1962, for the first time at 10:00 A.M.; that Jay could, at the time of admission to the hospital, move his legs slightly; that he had no sensation to a pinprick from the navel down; that two hours later upon examination the boy could not move his legs or use his feet or even move a toe; that he had complete loss of motor function, inability to move legs,

feet or toes and that the sensory level, the ability to perceive a pinprick, had gone up from the navel to the nipple line and that this had increased during the period of two hours; and that such rapid development of the retreating sensory perception line indicated a recent onset of disease or illness.

Dr. McKinney testified that after the paralysis was complete he performed a spinal tap which was done at the intervertebral space between the 4th and 5th lumbar vertebrae; that the spinal cord ends at the second lumbar vertebra and that the spinal puncture did not involve any risk to the spinal cord. Dr. McKinney stated that an analysis of the fluid taken in the spinal tap in connection with what is known as a kwakenstadt procedure by which pressure is placed over the jugular vein indicated that there was blockage in the spinal canal and such analysis of the spinal fluid showed only seven white blood cells which was normal. There were no red blood cells; the protein showed 304 milligrams percent with no sugar present in the spinal fluid.

Further, Dr. McKinney testified that Jay Ison was x-rayed from the skull all the way down the thoracic spine, the lumbar spine and the sacral spine and that these x-rays showed no bony damage or dislocation of the spine.

The defendant offered the following expert testimony in his defense: (1) His own testimony; (2) Dr. Henry Chamberlain, D.C. of Knoxville, Tennessee; (3) Dr. Frank Sartz, D.C. of Morristown, Tennessee and (4) Dr. Kemp Davis, M.D. of Morristown, Tennessee.

We have already discussed the testimony of Dr. McFall. Dr. Chamberlain testified that he was a graduate

of Logan College of Chiropractics in St. Louis, Missouri, in 1949 and was licensed in Missouri in 1949; that he remained as an instructor on the staff at Logan College after graduation until November, 1955, when he moved to Knoxville, Tennessee, and set up private practice. He has served three terms as president of the Tennessee Chiropractic Association and was named Chiropractor of the Year for the State of Tennessee for the years 1961-1962.

As an expert he testified that he had read the x-rays of Jay Ison taken by Dr. McFall and in answer to a hypothetical question stated that the adjustment given by Dr. McFall to Jay Ison on Saturday morning after being informed that he was losing the use of his legs was in keeping with the degree of skill and ability exercised by other chiropractors in the school to which he and Dr. McFall belonged; and that the treatment of paralysis of the legs was included within the field of chiropractic. Further, he testified that it was impossible to give an adjustment forcing a vertebra out of position and against the spinal cord so as to paralyze a patient; that the force applied in an adjustment of the cervical region of the spine would be approximately the amount of pressure the eyeball could withstand. However, on cross-examination, he did admit that in chiropractic treatment there was at times sufficient force applied to cause a vertebra to be forced apart and to result in a popping sound.

From Dr. Sartz' testimony we quote as follows:

"Q. Would you describe the method of giving adjustments by the school of chiropractors to which you and Dr. McFall belong?

"A. Well, the method that we use is what we call giving an adjustment to the vertebrae of the spinal

column, that is we determine which vertebra has become displaced, how it has become displaced, if there is pressure upon nerves, then we learn the proper directions of these displacements and we proceed to put a patient upon a chiropractic adjusting table in the proper position, get the maximum amount of relaxation and proper contact on the vertebra, and with it we give a speedy thrust sufficiently to trigger the internal resistive force which actually resets that vertebra back into its normal position to relieve the pressure from the nerves.

"Q. Can you estimate the number of adjustments you have given since you have been practicing?

"A. No, it would run into a good many thousands, but I would say anywhere up toward thirty thousand or more.

"Q. How much force is used ordinarily in giving adjustments?

"A. In giving an adjustment you don't give any more than well, * * * about as much pressure as you would put on your eye ball with your finger, it is about that much, in other words from about a pound to not over five pounds which is a very small amount of pressure. * * *"

Dr. Sartz graduated from Palmer College of Chiropractic in Davenport, Iowa, in 1931 and has been practicing in Morristown since 1933. He gave his expert opinion that the treatments by Dr. McFall of Jay Ison after knowledge of the partial paralysis and tingling sensation were in keeping with the degree of skill and ability of chiropractors in the same school to which he and Dr. McFall belonged, and that the treatment of paralysis of the legs

was included in the school of chiropractic where there was an impingement of the nerve in the spine.

Again we quote from his testimony as follows:

"Q. Is it a part of your school of practice that you can exert all of the force that you want to on the back?

"A. Yes, sir, I have seen our instructor demonstrate to us, all of the force,—he was a man just about your size, that he could exert and it didn't do any damage.

"Q. Didn't do any damage?

"A. No, sir.

"Q. It could have done damage though, couldn't it?

"A. No, it sure couldn't.

"Q. Is it your statement to this court and jury that there is no way you can apply enough force on the back or the spine to damage the spinal cord?

"A. I might give you an illustration on that——

"Q. Just answer the question.

"A. No, you just couldn't do it.

"Q. You just can't put enough force on the human back to hurt it, is that right?

"A. Not in giving a treatment you sure couldn't.

"Q. Go ahead and give your explanation now.

"A. At the Palmer College they have taken a group of women during pregnancy and they have given them every known kind of abnormal adjustment to see if a miscarriage could be performed, and it was absolutely impossible, every one of the women that volunteered to

takc these abnormal adjustments had a perfect **delivery.**

\* \* \*

"Q. Any pressure on that spinal fluid is going to be transmitted up and down the entire spinal canal?

"A. It's possible that you would have some, but it would be so minute that I seriously doubt it, if that's the case then by any bump that a man may have out here in his normal activities he would have an injury to the spinal cord.

Q. Does it take a small amount of force or a large amount of force to force the vertebrae apart?

"A. It would take a terrific amount of force.

"Q. And I take it then, if they were forced apart to the point where they popped, that a tremendous amount of force was used?

"A. Well, not necessarily. Just because a vertebra pops is no sign that you have moved it. Lots of times it is the fluid in the muscle tissues that causes the popping."

Dr. Kemp Davis, M.D., of Morristown, Tennessee, who was at the time Chief of Surgical Service at the Morristown-Hamblen Hospital, testified that on October 11, 1962, at the request of the defendant, he did a medical history, a physical examination, a neurological examination and reviewed the record on Jay Ison, aged 16, at the Holston Valley Community Hospital in Kingsport; that he had examined him on February 12, 1963, and again on April 11, 1963, at the East Tennessee Children's Hospital and again made a careful review of Ison's medical records. Based on the examination, history and medical records

Dr. Davis gave as his opinion that the spinal block of Jay Ison was caused by an infection such as spinal meningitis which was secondary to a virus infection such as the Asiatic flu epidemic. He further gave as his opinion that Jay Ison would continue to improve slowly over the ensuing months and would regain a great deal of his mobility.

On cross-examination Dr. Davis stated that he had never seen the x-ray pictures which had been taken by Dr. McFall. The x-ray pictures were then presented to him for interpretation. Dr. Davis stated that the pictures revealed no abnormality, misalignment or subluxation of that portion of the spine of Jay Ison shown in the x-ray pictures taken by Dr. McFall. He received $750.00 for his examination and testimony in the first trial; no conversation had been had between him and the defendant relative to his services in the second trial but he expected to be compensated.

Plaintiffs' declaration was in three counts. Count No. 1 charged the defendant with the following acts of negligence:

"1. In failing to properly diagnose the plaintiff's condition;

"2. In attempting to treat, or in continuing to attempt to treat, the plaintiff by manipulation, when he knew, or should have known, that such continued manipulation would result in injury to plaintiff;

"3. In manipulating plaintiff's back and spine in such a manner as to injure his spinal cord, and the plaintiff expressly pleads and relies upon the doctrine of res ipsa loquitur;

"4. In failing to cease the treatments and manipulations, after he knew, or should have known, that the plaintiff's condition was beyond his skill and ability;

"5. In failing to inform the plaintiff of the serious consequences of the treatment and manipulations;

"6. In failing to advise plaintiff to seek other and different physicians and specialists, after the same resulted in a worsening of plaintiff's condition, and in continuing to attempt manipulation of the spine after such result was apparent."

The second count charged the defendant with negligence as follows:

"That the treatment by manipulation, on the part of the defendant, was negligently done in a violent manner, and that such unnecessary violence was the direct and proximate cause of the injury to the plaintiff's spine, and the resulting injury and damages to him, * * *."

The third count charged that the defendant violated T.C.A. Section 63-605 by attempting to practice medicine in his treatment of the plaintiff without having the proper license therefor. T.C.A. Section 63-605 is as follows:

"63-605. License required to practice.—No person shall practice medicine in any of its departments within this state unless and until such person shall have obtained a certificate of fitness from the state board of medical examiners, created by sec. 63-601, and shall have obtained a license and a certificate of registration from the state licensing board for the healing arts as provided in chapter 1 of this title; provided, however, that the provisions in this chapter with reference to

obtaining a certificate of fitness from the state board of medical examiners shall not apply to any person who on July 1st, 1947, was duly and regularly licensed by law to practice medicine in any of its branches in this state. (Acts 1901, ch. 78, sec. 1; 1905, ch. 111, sec. 1; Shan. sec. 3609a13; Code 1932, sec. 6918; impl. am. Acts 1947, ch. 9, secs. 2-4, 9; mod. C.Supp.1950, sec. 6918.)''

At the conclusion of all the proof the Trial Judge directed a verdict on the third count of the declaration and let the case go to the jury only on the first two counts.

Plaintiffs' assignments of error Nos. I and III are as follows:

*"Assignment No. One*

The Court erred in directing a verdict for defendant upon the third counts of the declarations.''

*"Assignment No. Three*

The Court erred in refusing to admit the testimony of any of plaintiffs' medical witnesses, to the effect that the defendant stepped out of his field of chiropractic science, and became involved in or invaded the field of the practice of medicine, in attempting to treat paralysis of the legs.''

T.C.A. Section 63-401 defines the science of chiropractic as follows:

"63-401. 'Chiropractic' defined.—Chiropractic is defined as the science of palpating, analyzing, and adjusting the articulations of the human spinal column and adjacent tissues by hand. (Acts 1923, ch. 9, sec. 5; Shan.Supp., sec. 3654a120; Code 1932, sec. 7013; Acts 1941, ch. 29, sec. 2; C.Supp.1950, sec. 7013.)''

Webster's International Dictionary, second edition, defines articulation as follows:

"5 * * * a. A joint or juncture between bones or cartilages in the skeleton of a vertebrate. Articulations may be immovable, when the bones are directly united (synarthrosis); slightly movable, when they are united by an intervening substance (amphiathrosis); or more or less freely movable, when the articular surfaces are covered with smooth cartilage and surrounded by a febrous capsule lined with synovial membrane (diathrosis)."

■ The record affirmatively shows that Dr. McFall administered no drugs to the plaintiff, Jay Ison, and gave no treatment to any other portion of young Ison's anatomy except his spine. The Trial Judge correctly directed a verdict in favor of the defendant on the third count of the declaration charging a violation of T.C.A. Section 63-605.

■■ We see nothing in T.C.A. Section 63-401, supra, defining "chiropractic" which would prohibit the defendant or any other chiropractor from treating a patient afflicted with paralysis so long as he, in good faith, believed that a manipulation of the spine would be of benefit to such patient. In such cases the field of the M.D. and the chiropractor overlap. Therefore, assignments of error I and III are respectfully overruled.

Assignments of error IV, V and VI are as follows:

"*Assignment No. Four*

The Court erred in permitting defendant's medical witness, Dr. J. Kemp Davis, to examine the plaintiff, at the request of the defendant, to qualify himself to

testify, to give his opinion as to the cause of the condition of Jay Ison, based upon subjective symptoms.

"*Assignment No. Five*

The Court erred in permitting the defendant's medical witness, Dr. J. Kemp Davis, to state his opinion as to the cause of the paralysis of Jay Ison, on the basis of an out of court review by the witness of the hospital and medical records maintained not by him but by Jay Ison's own physicians, and at the hospital in which he has been confined, said Dr. Davis not being the physician of Jay Ison, and never having treated him.

"*Assignment No. Six*

The Court erred in permitting said Dr. J. Kemp Davis, as defendant's medical witness, to express his opinion as to the prognosis of Jay Ison in which he expressly based his answers not only upon his examination of the boy, but also upon the basis of the review of the above mentioned hospital and medical records."

The plaintiff-in-error cites and relies upon our case of Higgins v. Steide, 47 Tenn.App. 42, 335 S.W.(2d) 533.

In the Steide case, opinion by Judge Avery of this section of the Court of Appeals, the following statement was made:

"* * * when the testimony is offered by a non-treating physician for evaluation and testifying purposes only, it must be based on some objective symptoms and not on subjective symptoms, such as peculiar motions of **parts of the body that the** so-called patient can pretend, whether real or feigned."

In the Steide case Judge Avery reviewed and referred to the many authorities relating to the testimony of

experts based on objective and subjective symptoms. However, in the Steide case the question was raised as to the competency of the testimony of Dr. Mitchell who had examined plaintiff at the request of the plaintiff's treating physician for the express purpose of evaluating the plaintiff's injury.

The prevailing view is that a question calling for the witness' expert opinion on the basis of reports of other doctors or hospital charts and records without reciting the contents of such reports and records in the question as hypotheses is improper. McCormick on Evidence, 1954, page 32.

■■ In the case at bar the testimony of Dr. Davis as to the cause of plaintiff's paralysis was based on the hospital reports and charts and the reports of the physicians treating the plaintiff. Plaintiff's treating doctors testified in court and the hospital charts and records were filed in evidence. It does not appear that Dr. Davis based his expert opinion on any subjective symptoms of the plaintiff Ison. Since the treating physicians for the plaintiff had already given their opinion as to the cause of the plaintiff's paralysis based on the hospital charts and and reports, we think it was proper for His Honor the Trial Judge to permit Dr. Davis as a witness for the defendant to give his opinion as to the cause of plaintiff's paralysis based on these same hospital charts and records. Also we think the same rule would apply with reference to the expert opinion of Dr. Davis as to the probability of plaintiff's recovery in the future. If we are wrong in this opinon, then it would appear that the expert opinion of Dr. Davis could have been brought into the record by answer to a hypothetical question and the same result accomplished. Hence, the error, if any, would

be harmless error. Therefore, assignments of error IV, V and VI are respectfully overruled.

■■ Assignment of error No. VIII complains that the Trial Court erred in stating to all of the members of the prospective jury panel that "he (Murrell Ison) shouldn't have been talking to a juror when he excluded a venireman, Mr. Mays. Mr. Mays stated on voir dire examination that he had discussed the case with Mr. Ison. We think the Trial Judge was eminently correct in discharging Mr. Mays. We see no prejudice to the plaintiff from the court's statement. Therefore, assignment of error No. VIII is respectfully overruled.

Assignment of error No. II and No. X are as follows:

"*Assignment No. Two*

The Court erred in refusing to admit the testimony of plaintiffs' medical witness, Dr. P. P. Neblett, Jr., with respect to plaintiffs' hypothetical questions propounded to him, or to give his opinion as to the cause of the paralysis of Jay Ison, in accord with the offer of proof made by the plaintiffs in which it is manifested that said witness would have testified that the paralysis was caused by a blood clot, in turn caused by the chiropractic treatment administered by defendant. The hypothetical questions are to be found in the record on pages 109-110, and the offer of proof, rejected by the Court, will be found in the record pages 128-134."

"*Assignment No. Ten*

The Court erred in refusing to permit the plaintiffs' medical witness to testify concerning the cause of Jay Ison's paralysis, or give their opinion as to whether

the defendant's treatment had been in accord with the standards of any school of the healing arts, unless the plaintiffs were able to show that these medical witnesses were familiar with the techniques and methods employed by a chiropractor.''

In Beech v. Hunter, 1931, 14 Tenn.App. 188, This court, speaking through Judge Crownover, upheld a verdict of $1,000.00 in favor of a plaintiff who had become paralyzed as a result of a chiropractic adjustment on her spine. The defendant, Dr. Hunter, had examined her back and spinal column and found ''an impinged nerve running out of the shoulders, causing pain through the region of the shoulders and back'' and also three misaligned or displaced vertebrae.

Dr. Hunter, the chiropractor, had given the plaintiff, Mrs. Beech, fourteen chiropractic treatments with little effect. After she received the fifteenth treatment on the morning of October 22, 1929, she was lifted by the defendant from the adjustment and unable either to stand or walk. She was paralyzed at the time of the trial.

The defendant contended (1) that he did not press upon the plaintiff's back during that fifteenth treatment but only turned on a heat lamp and massaged her back and (2) that he was not negligent in pressing upon her spinal column to adjust it, as he had used due diligence and all his skill in diagnosing her case and that he had diagnosed it as neuritis and treated her in accordance with the practices of chiropractic.

The proof of plaintiff, Mrs. Beech, consisted of the testimony of several medical doctors that she was suffering from Pott's disease which is tuberculin in origin and results in a deterioration of the vertebrae; that in

their opinion her paralysis was a result of pressure on the spinal cord due to displacement of the diseased vertebrae. One doctor stated that he considered the manipulation of the spinal column as the exciting cause of the paralysis. The Trial Judge charged the jury as follows:

"A physician is bound to bestow such reasonable and ordinary care, skill and diligence, as physicans and surgeons in the same (general) neighborhood in the same general line of practice ordinarily have and exercise in like cases."

"A physician is entitled to have his treatment tested by the school rules and principles of the school of medicine to which he belongs and not to another school. And if he performs the treatment with ordinary skill and care in accordance with his system, he is not answerable."

"In determining what constitutes reasonable and ordinary care, skill and diligence, the test is that which physicians and surgeons in the same general neighborhood ordinarily have and exercised in like cases.

"While a physician does not guarantee the cure of his patients and is not liable for an error in diagnosis, yet in performing an operation he is employing surgery as an art and is liable for negligence."

The Court of Appeals approved this charge as a correct statement of the law. There is nothing in the opinion of Beech v. Hunter to indicate that any chiropractor other than defendant, Dr. Hunter, testified in the case at all. All the other doctors testifying appeared to be M. D.'s. This court held that it was a question for the jury to determine on the basis of the testimony of the defendant,

Dr. Hunter, and the other doctors testifying in the case whether or not Dr. Hunter exercised the degree of skill and care ordinarily exercised by physicians of his school engaged in the same general line of practice in the same or similar locations. Judge Crownover cited Ogle v. Noe, 6 Tenn.App. 485, which was a malpractice case against a dentist in which the plaintiff recovered damages for a broken jaw sustained while having a tooth pulled by the defendant.

In the case at bar plaintiffs' first expert witness, Dr. Neblett, was asked a hypothetical question which included the assumption of the adjustment to Jay Ison's back by Dr. McFall for the entire week beginning August 6, 1962, which question described in detail the nature of the adjustment and asked Dr. Neblett for an opinion as to the cause of Jay Ison's paralysis. The question contained no mention of standard of care. The Trial Judge sustained an exception thereto because Dr. Neblett admitted he had never made a study of the treatments and methods of chiropractors. Thereupon, upon request of attorney for plaintiff the jury was withdrawn and the plaintiff made an offer of proof which covers twenty-two pages of the record. These pages are filled with colloquy between the court and attorney for the plaintiff regarding Dr. Neblett's lack of knowledge of chiropractic treatments. Dr. Neblett would have testified that in his opinion the manipulations of the spine by Dr. McFall on Saturday morning after the symptoms of partial paralysis of Ison had appeared were the cause of plaintiff's permanent paralysis; and that any person engaged in the healing arts including that of a chiropractor should have realized that it was dangerous and unwise to continue manipulations of the human spine after there was presented to him the fact that the patient was losing control

of the use of his legs. Upon the jury being returned to the courtroom His Honor the Trial Judge permitted the witness, Dr. Neblett, to give an opinion that the cause of the blocking of the spinal canal and the resulting paralysis was hematomyelia which is the medical term for hemorrhage into the spinal cord and that such hemorrhage was caused by trauma. The court admitted such evidence before the jury with this statement: "I am going to let it go to the jury for whatever it is worth." Transcript, page 138.

When Dr. McKinney was on the stand and plaintiff's attorney sought to prove the cause of plaintiff's injuries based on a hypothetical question which assumed the fact of the chiropractic manipulations and/or adjustment by Dr. McFall upon objection by attorney for defendant-in-error that Dr. McKinney was not qualified because of his lack of knowledge of chiropractic practice and procedure the court sustained the objection with this statement: "The Court sustains the objection. This doctor * * * Gentlemen, in the Court's opinion it would just be pulling an opinion out of the thin air." Transcript, page 202.

Later, during Dr. McKinney's examination after attorney for plaintiff-in-error had further qualified him as an expert by showing that he did have some knowledge of the methods of treatment by chiropractors the court permitted him to testify regarding the causes of plaintiff's injuries with this statement: "Oh, let him testify, let it go to the jury for whatever it's worth." Transcript, page 206.

Thereupon, he permitted Dr. McKinney to testify that the continued manipulative treatment and adjustments of the spine of Jay Ison after the patient had complained

of the loss of use of his legs and the tingling sensation in his legs were improper in any school of practice including that of chiropractic. Then His Honor the Trial Judge sustained an objection to the answer of Dr. McKinney to a hypothetical question which would have shown the manipulation and adjustment by Dr. McFall of the plaintiff, Jay Ison, as the cause of plaintiff's injuries.

In our opinion the learned Trial Judge improperly construed Beech v. Hunter, supra, 1931, 14 Tenn.App. 188, as holding that only a chiropractor or one thoroughly versed in chiropractic practice and procedure could give evidence showing plaintiff's injuries to have been the direct and proximate result of the professional treatment rendered by the defendant, Dr. McFall, a chiropractor, to the plaintiff.

While there is no evidence in the record as to the exact field and extent of the healing arts properly covered by the field of chiropractic yet in view of the definition given by T.C.A. Section 63-401 quoted above we construe the field of chiropractic to be limited to the treatment of those illnesses and diseases of the human body which doctors of chiropractic reasonably believe can be aided by the manual manipulation of the spine. On the other hand, the field of doctors of medicine covers all human illnesses and diseases and their diagnosis, treatment and prevention. We think it was entirely competent for the three medical doctors, presented as witnesses for the plaintiff all of whom had examined and treated the plaintiff, to testify as to the full nature and extent of plaintiff's injury, his treatment and to give their expert opinion as to the cause of plaintiff's paralysis. By the same token, of course, the defendant was entitled to have

his expert witnesses, M. D.'s or Chiropractors, disprove the theory of the plaintiff that his paralysis was caused by defendant's manipulation of his spine. These two assignments are sustained.

■ Assignment of error No. VII assigns error of the court in failing and refusing to give several special requested charges:

Plaintiffs' first request was as follows:

"I charge you that where a chiropractor steps out of his own field and into the field of medicine, he must be judged by the accepted standards in the field in which he enters."

Plaintiffs' third request was as follows:

"I charge you that Tennessee Code Annotated Section 63-401 defines chiropractory as the science of palpations, analyzing and adjusting the articulations of the human spinal column and adjacent tissue by hand, and the right of a chiropractor to treat a patient is limited by the above definition.

"If you find that Dr. McFall stepped out of his field as a chiropractor, and invaded the field of the practice of medicine, as is prohibited by Tennessee Code Annotated 63-605, then such violation of such statute would be negligence per se, and if you further find this to be the proximate cause of the injury to Jay Ison, you should find in favor of the plaintiffs, and against the defendant."

We think His Honor properly refused to charge these two special requests for the reasons set out in discussion of assignments of error Nos. I and II, supra.

Plaintiffs' second request was as follows:

"I charge you that a chiropractor who knows, or should know, that any treatment he is permitted to use will be of no benefit to his patient is under the duty to so advise the patient, since a chiropractor is in a position of trust and confidence toward the patient."

In our opinion this request was a correct statement of the law, was not contained in the original charge of the court and it was affirmative error for His Honor the Trial Judge to refuse this request. Any physician, chiropractor or M. D., occupies a fiduciary relationship toward his patient. Hall v. De Saussure, 1956, 41 Tenn.App. 572, 297 S.W.(2d) 81.

Plaintiffs' fourth request was as follows:

"I charge you that a chiropractor is under the duty to cease and desist from treating his patient, and to advise him to seek other relief, where he knew, or should have known, or discovered, that his methods of treatment were not of a character productive of reasonable success."

While we think this requested charge was not couched in the best language, it was a correct statement of the law and was not adequately covered in His Honor's charge and we think His Honor was in error in refusing to give the request.

Plaintiffs' fifth request was as follows:

"Even though the chiropractor, in ordinary circumstances, has the right to have his treatment tested by the standards of the school of practice to which he belongs, the law permits a regularly licensed physician and doctor of medicine to testify in a suit involving a chiropractor, where the condition to be treated is

such that it should be recognized by any physician of any school.''

In our opinion this requested charge is in consonance with the holding of our court in the case of Beech v. Hunter, 14 Tenn.App. 188, supra. See also Kelly v. Carroll, 36 Wash.(2d) 482, 219 P.(2d) 79, 19 A.L.R.(2d) 1174. We think this requested charge should have been given.

Plaintiff's sixth request was as follows:

"Even though the standard of care and skill is ordinarily a question to be determined from expert testimony by practitioners of the healing arts, I charge you that where manipulations by a chiropractor are followed immediately by pain and disability, a prima facie case of liability is thus made out, and the plaintiff is not required to show, by expert testimony, the unskillfulness of the treatment.''

In a very recent case of Crowe v. Provost, 1963, 52 Tenn.App. 397, 374 S.W.(2d) 645, the Middle Section of this Court, opinion by Judge Chattin, upheld a $25,-000.00 jury verdict for the death of a 22 months old child against Dr. Provost, M. D. and his nurse, Mrs. McKee, for the negligence of Dr. Provost and his nurse in failing to properly administer to the said child who died within a short time after receiving a shot of penicillin and a shot of cosa-terrabon administered by the nurse upon orders of Dr. Provost. Within an hour after the last shot the child screamed and lapsed into a condition of unconsciousness, was carried to the office of the doctor who was out, the nurse called the doctor who reported he would be there soon and the nurse left for lunch. When the doctor arrived, the child was dead.

It was the theory of the plaintiff that the child drowned in its own vomit while lying on its back on the treatment table; that if the nurse had been there, the nurse would have known to have kept the child in an upright position and not on its back while vomiting. The defendant, Dr. Provost, and several other M. D.'s testified that the death of the child was not due from drowning in his own vomit but because of an overwhelming virus infection.

It was the contention of the defendant, Dr. Provost, that since all the expert medical proof showed conclusively that the child died from an overwhelming virus infection that the Trial Court should have directed a verdict in favor of the defendant. This contention was overruled in the opinion by Judge Chattin and we quote from his opinion as follows:

"We think jurors of ordinary intelligence and judgment, although not skilled in medical science, are capable of reaching a conclusion without the aid of expert testimony, from these proved facts and circumstances, whether injurious consequences or death would probably result to the patient without proper medical or nursing attention.

\* \* \* \* \* \*

" 'Opinions of medical experts as to the cause of death, disease, or personal injuries, either in answer to a hypothetical question or based on personal observation and examination, do not invade the province of the jury, but go to them to be weighed along with the other evidence in passing on the question of causation; or, stating the rule more broadly, when expert opinion as to causation is admissible, the weight of the opinion is to be determined by the jury.' 20 Am.Jur., Evidence,

Section 867, page 731; Nashville, Chattanooga & St. Louis Railroad Company v. Jackson, 187 Tenn. 202, 213 S.W.(2d) 116.

" 'The rule that a verdict in a malpractice action cannot be based on speculation or conjecture as to cause does not necessarily require that the plaintiff prove causation by direct and positive evidence, which excludes every other possible hypothesis as to the cause of the injuries, it generally being held that if a fair preponderance of the evidence discloses facts and circumstances proving a reasonable probability that the defendant's negligence or want of skill was the proximate cause of the injury, the plaintiff has supported his burden of proof sufficiently to justify a verdict in his behalf.' 12 A.L.R.(2d) Annotation, Proximate Cause, Malpractice Actions, Section 4, page 28; Johnson v. Ely, 30 Tenn.App. 294, 205 S.W.(2d) 759.

* * * * * *

"Accordingly, we are of the opinion the medical proof in the record that some condition for which defendants would not be liable because not due to any act of negligence on their part might have caused the death of the child does not destroy or overcome as a matter of law the probative force of the evidence that the more probable cause was the negligence of the defendant nurse in abandoning an ill and unconscious child.''

While no assignment is made thereon it appears that His Honor may have placed too strong a burden upon the plaintiff in his charge with reference to circumstantial evidence when he charged, ''* * * That, like any other fact, negligence may be proved by circumstantial evi-

dence, but the circumstances relied on must be of such a nature and so related one to the other that the only reasonable conclusion to be drawn is the theory sought to be established." Transcript, page 386.

However, in the case at bar the Trial Judge was not in error in failing to charge special request No. 6 above quoted because the plaintiff, Jay Ison, did produce and rely upon expert testimony of three M. D.'s tending to support plaintiff's theory of the case as to the cause of his injuries and negligent treatment at the hands of the defendant.

Plaintiff's request No. 7 was as follows:

"It is no defense to say that Jay Ison had a previous injury to his back, or a congenital defect therein, and that he would finally have become a paraplegic anyway. The liability of one who negligently or unlawfully injures the person of another is not to be measured by the physical strength of the party injured or his capacity to endure suffering. One of weak physical structure or little vitality or ill health has as much right to protection from violence and negligence as a robust athlete, and has a right to recover from injuries sustained, that are the natural consequence of the wrongs proximately causing such injuries.

"Thus, if you should find that Jay Ison had already injured his back, when he first consulted Dr. McFall, or that he had a congenital weakness therein, neither of which was disabling, and if you should further find that the manipulations by Dr. McFall were the direct and proximate cause of the exciting or aggravating this condition, and causing the paralysis, and if you further find this to be actionable negligence on the part

of Dr. McFall, as hereinbefore explained to you, then you will find in favor of the plaintiffs, and against the defendant.''

 In our opinion this requested charge was consistent with the principles announced in Beech v. Hunter, 14 Tenn.App. 188, and other cases including Meeks v. Yancey, 43 Tenn.App. 667, 311 S.W.(2d) 329. It was not covered in the Court's original charge and we think His Honor the Trial Judge was in error in refusing to give such charge.

Assignment of error No. IX is as follows:

''The Court erred in commenting, in the presence of the jury, upon the matter of the evidence of plaintiffs' medical witness, Dr. James Ray McKinney, the Court making the statement, that if the witness were permitted to answer the question propounded to him, it would be allowing the witness to 'pull an opinion out of the air.' Following this remark, the Court permitted the witness to answer the question. Reference is made to Page 202 of the transcript, as to this statement of the Court.''

We have shown that often the Trial Judge admitted some of plaintiffs' expert testimony with the statement, ''I'll let it go to the jury for whatever it is worth.'' On one occasion His Honor the Trial Judge, in sustaining an objection to Dr. Neblett's testimony, stated:

''Q. Now, Doctor, assuming that a patient complained of the loss of use of the legs, and a tingling sensation in the legs, what is the standard accepted medical treatment for such a condition?

''MR. ANDERSON: I object to that, Your Honor.

*"THE COURT:* Doctor, do you mean to say that everybody that has a little tingling, or a little soreness in their limbs is going to have paralysis?

"A. I didn't make that statement, Your Honor.

*"THE COURT:* Sustained." Transcript, page 141

Very probably the jury considered these remarks by His Honor as being spoken disparagingly of portions of plaintiffs' proof. However, no exceptions were taken by the plaintiffs' attorney and the assignment of error must be overruled. Trentham v. Headrick, 1950, 35 Tenn. App. 330, 245 S.W.(2d) 632.

However, we think reversible error was committed upon the trial below and accordingly, the judgment of the lower court will be reversed and the cause remanded for a new trial consistent herewith. The costs in this court will be taxed against the defendant, Dr. McFall. The costs in the court below will abide the subsequent trial.

Avery, P.J.(W.S.), and Bejach, J., concur.