**Jerry BOLTON, Plaintiff/Appellee,**

v.

**CNA INSURANCE COMPANY,
Defendant/Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Dec. 9, 1991.

Michael J. Mollenhour, Patty W. Parnell, Knoxville, for defendant/appellant.

Michael G. Hatmaker, Jacksboro, for plaintiff/appellee.

## OPINION

ANDERSON, Justice.

In this worker's compensation action, the Chancellor awarded 60 percent permanent partial disability benefits and future medical expenses. The defendant insurance

company appeals, contending the evidence preponderates against the judgment because the permanent disability award was based, in part, on the opinion of a physical therapist, who the defendant contends is not a qualified medical expert, and because nonwork-related injuries contributed to the worker's disability.

## FACTUAL BACKGROUND

The plaintiff, Jerry Bolton ("Bolton"), aged 42, went to work in 1987 as a heavy equipment operator for Charles Blalock and Sons, which was insured for worker's compensation by the defendant, CNA Insurance Company ("CNA"). After graduation from high school and before 1987, he had worked as an assembly line worker, a heavy equipment operator, a truck driver, and a coal mine operator.

On the morning of November 2, 1988, Bolton was injured when he fell from the icy catwalk of a front-end loader while attempting to clear frost from the windshield. He fell approximately 10 to 12 feet to the rocky, frozen ground below, landing on his left hip, back, and shoulder. Shortly thereafter, he was taken to see Dr. Klein at Oneida, who referred him to Dr. William Foster, an orthopedic surgeon, in Knoxville.

When Bolton first saw Dr. Foster on November 8, 1988, he complained of pain in his neck and low back. Dr. Foster found that he had very little motion in his neck and low back, but that x-rays were within normal limits. Conservative treatment, consisting of traction, heat exercises and drugs, was recommended.

After treating Bolton twice in November of 1988 without any significant improvement, a cervical and lumbar MRI was performed in December of 1988. Dr. Foster thought the MRI demonstrated "he [Bolton] probably had a ruptured cervical disc," and referred him for evaluation of the neck injury to Dr. William Reid, a neurosurgeon at U.T. Hospital.

After examining the patient and reviewing the MRIs, Dr. Reid found the cervical range of motion reduced and bulging discs in both the lumbar and cervical regions. However, no rupture, no nerve root compression, and no evidence of a neurological cause for the complaints of neck pain were found. As a result, no permanent impairment was assessed. Bolton had been evaluated a year earlier by Dr. Reid for a cervical strain suffered in a July 1987 automobile accident. Those earlier findings and conclusions as to the cervical spine were almost identical to the present findings. Although Bolton complained at the earlier evaluation of neck pain, he had worked since with little difficulty.

Following his evaluation by Dr. Reid, Bolton continued to experience pain in his neck and lower back and returned to see Dr. Foster in January and February of 1989. Because he was not improving, caudal blocks were prescribed for relief; however, there was little improvement.

On March 11, 1989, Bolton was involved in a head-on automobile accident, from the scene of which he was removed to the hospital by ambulance. He testified that as a result of the accident he suffered a knee injury and was "stove up" for a couple of days, but had no significant increase in back or neck pain.

On March 15, 1989, shortly after the wreck, Bolton once again went to see Dr. Foster because he was still having pain in his neck and back. Bolton was admitted to the hospital on March 19, 1989, for a myelogram and conservative treatment, including physical therapy. The myelogram showed a ruptured cervical disc similar to Dr. Foster's interpretation of the December 1988 MRI. However, there was no nerve root pressure and the lower back was normal. Caudal blocks were administered once again, and Bolton was discharged from the hospital on March 27, 1989.

Following his release from the hospital, Bolton continued to see Dr. Foster periodically until November of 1989. Throughout this period, complaints of low back and neck pain continued, and limited range of motion in the cervical and lumbosacral spine was noted. His last visit was on November 15, 1989, at which time a full range of motion in the neck and restricted

motion in the back was observed. Dr. Foster felt that Bolton had reached his maximum medical improvement and assigned him a 3 to 5 percent permanent partial impairment rating, based upon the low back injury which he had diagnosed as a chronic strain. He placed no restrictions on Bolton's physical activity.

On December 7, 1989, Bolton was referred by his attorney to Kelly Lenz, a licensed physical therapist, for evaluation. After a variety of tests, Lenz determined that he had limitations in cervical motion and lumbar motion. Based on this evaluation, Lenz later testified, over objection, that she used the American Medical Association's Guidelines for Evaluation of Permanent Impairment ("AMA Guidelines") to give him an impairment rating. She said that he had a 6 percent impairment based on the limited range of cervical motion and a 13 percent impairment based on the limited range of lower back motion, for a total whole-body impairment rating of 18 percent. Lenz testified, also over objection, that she placed physical restrictions upon Bolton's activity, including lifting and other physical activity. Lenz further said that Bolton told her the 1989 automobile accident increased his lower back and neck symptoms significantly.

In January of 1990, Dr. Norman E. Hankins, a vocational rehabilitation expert, evaluated Bolton. Relying on his own testing, the Lenz future restrictions on physical activity, and job data, Dr. Hankins assessed a vocational disability rating of 71 percent.

Bolton was evaluated by Rodney E. Caldwell, a private vocational consultant, in August of 1990, who found that if Bolton were capable of medium work, he had a vocational impairment rating of 5 to 10 percent; but if he were only capable of light work, the vocational impairment rating was 30 to 35 percent. Caldwell felt the Lenz tests demonstrated Bolton could do medium work.

Based on the foregoing, the Chancellor found that Bolton had a considerable loss of access to the labor market because he had practically no transferable job skills, but thought Bolton would be capable of retraining because of his "very high IQ" and natural ability. The Chancellor awarded 60 percent permanent partial disability and payment of future medicals.

Our review of findings of fact by the trial court is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn.Code Ann. § 50–6–225(e) (1983 & Supp.1991); *Lollar v. Wal–Mart Stores, Inc.*, 767 S.W.2d 143, 149 (Tenn. 1989).

## CAUSATION

■ CNA first argues that Bolton did not establish by a preponderance of the evidence that his permanent partial disability resulted from the injury he sustained on November 2, 1988. CNA does not dispute that Bolton was injured within the scope of his employment in November of 1988; however, CNA questions whether all of his permanent partial disability is attributable to the work-related injury. Specifically, CNA says that Bolton's automobile accident in March 1989 contributed to his disability and implies that his 1987 accident also exacerbated his condition. It is true that except in an obvious case, the employee must establish by expert medical testimony the causal relationship between the injuries complained of and the employment activity. *Masters v. Industrial Garments Manufacturing Co.*, 595 S.W.2d 811, 812 (Tenn.1980).

Here, Dr. Foster testified Bolton's injuries were caused by the work-connected fall in November of 1988. No other physician testified about causation. Because of the intervention of the March 1989 automobile accident, he conceded the date, earlier than November of 1989, Bolton might have reached maximum medical improvement could not be determined. However, as to the permanent effect of the automobile accident, he testified:

A. I don't think it led to any more impairment than, you know, than he already had. I think it just delayed his treatment.

**Q.** Other than a delay in recovering?

**A.** Yes.

CNA contends that this testimony is equivocal and speculative, and that this fact, coupled with Dr. Reid's failure to diagnose any neurological impairment, demonstrates that Bolton failed to prove that his permanent partial disability arose solely as a result of his November 1988 work-related injury.

It is true, as CNA argues, that expert medical proof must not be speculative and equivocal. It is also true, however, that absolute certainty is not required for proof of causation. What is required is that the "medical proof that the injury was caused in the course of the employee's work must not be speculative or so uncertain regarding the cause of injury that attributing it to the plaintiff's employment would be an arbitrary determination or a mere possibility." *Tindall v. Waring Park Association,* 725 S.W.2d 935, 937 (Tenn.1987).

We are satisfied that the testimony of Dr. Foster, who treated Bolton both before and after the 1989 automobile accident, is sufficiently certain to establish that the cause of his permanent disability was the work-connected injury. The delay in recovery would implicate temporary total disability benefits only, which were terminated in June 1989, six months before maximum medical improvement was attained. Moreover, neither party has raised the issue of temporary total benefits at trial or on appeal.

Accordingly, we conclude Bolton's work-connected injury and resulting permanent disability arose out of and in the course of his employment.

## COMPETENCY OF EXPERT TESTIMONY

CNA next contends that the expert testimony establishing Bolton's vocational disability was inadmissible, because it was based on the medical expert opinion of a physical therapist, who CNA argues is not qualified to determine and testify to a permanent partial impairment, or to permanent physical restrictions, of a worker's compensation claimant.

■ We have not previously considered the issue of whether a physical therapist is an expert competent to assess permanent disability and to determine permanent physical restrictions. We have previously decided that lay testimony generally is incompetent to support a finding of medical causation or a finding of permanent disability, and that only a medical expert can testify as to whether a given disability is permanent, except in the most obvious of cases. *See Argonaut Ins. Co. v. Williams,* 580 S.W.2d 784 (Tenn.1979), and *Owens–Illinois, Inc. v. Lane,* 576 S.W.2d 348 (Tenn.1978). We, therefore, are required to determine whether a physical therapist is such a medical expert.

In that connection, this Court has in the past examined the proper scope of testimony from other health professionals and determined that a professional is competent to testify as an expert only as to matters within the limited scope of his or her expertise and licensure. *See Smith v. Hale,* 528 S.W.2d 543 (Tenn.1975) (chiropractor); *Tom Still Transfer Co. v. Way,* 482 S.W.2d 775 (Tenn.1972) (chiropractor); *American Enka Corp. v. Sutton,* 216 Tenn. (20 McCanless) 228, 391 S.W.2d 643 (1965) (optometrist); *Ward v. North Am. Rayon Corp.,* 211 Tenn. (15 McCanless) 535, 366 S.W.2d 134 (1963) (chiropractor).

Our analysis of the scope of a physical therapist's expertise and licensure begins with a review of the Occupational and Physical Therapy Practice Act. "Physical therapy" is defined by the Act as:

> [T]he health specialty that is involved in health promotion, prevention and treatment of any injury, condition or disease through the evaluation and treatment of such injury, condition or disease by the use of physical, chemical or mechanical agents, the properties of heat, light, water, electricity, massage, sound, therapeutic exercises and mobilization, including active and passive movement, rehabilitation procedures, treatment planning, instruction, modification and consultative services in the establishment of physical therapy programs for patients, *under*

*the written or oral referral of a licensed doctor of medicine, dentistry, podiatry or osteopathy, except for the initial evaluation which may be conducted without such referral.*

(B) The use of roentgen rays and radium for any purposes and the use of electricity for surgical purposes including cauterization, are not included in the practice of physical therapy nor authorized under these terms.

(C) Nothing in the exception at the end of subdivision (a)(9)(A) excepting the initial evaluation, which may be conducted without referral, shall be construed as authorizing a physical therapist, or physical therapist assistant, or any other person to practice medicine, osteopathy, or podiatry or any other method of healing as authorized by the state....

Tenn.Code Ann. § 63–13–102(a)(9)(A)(B) and (C)(1990 & Supp.1991) (emphasis added). Accordingly, a physical therapist is allowed to evaluate and treat an injury using only specific agents, properties and methods, but she/he may do so only by referral of a licensed doctor of medicine, osteopathy or podiatry, except for the initial evaluation. Even then, nothing in the act is to be construed as authorizing a physical therapist to practice medicine, osteopathy or podiatry, or any other method of healing as authorized by the state. Tenn.Code Ann. § 63–13–102(a)(9)(C)(1990 & Supp.1991).

The Act also contains grounds for revocation of a physical therapist's license and provides for criminal penalties for treating human ailments, other than by physical therapy as defined, and for practicing physical therapy except upon referral of a licensed doctor of medicine, dentistry, podiatry or osteopathy. Tenn.Code Ann. § 63–13–307(a)(8) and (17)(1990). It is true that the definition section of the Act was amended by the Legislature in 1988 to provide that an initial evaluation could be conducted without referral by a licensed physician. Tenn.Code Ann. § 63–13–102(a)(9)(A). However, none of the sec-

tions dealing with licensing or grounds for revocation of license were amended. To that extent, the sections are in conflict and create uncertainty as to the nature of the scope of a physical therapist's initial evaluation.

The practice of medicine from which physical therapists are excluded is defined as: "Any person shall be regarded as practicing medicine within the meaning of this chapter who shall treat, profess to treat, operate on, or prescribe for any physical ailment or any physical injury to or deformity of another...." Tenn.Code Ann. § 63–6–204. This Court has broadly interpreted this statute in holding that the scope of the practice of doctors of medicine covers all human illnesses and diseases and their diagnosis, treatment and prevention, as compared to a chiropractor whose scope of practice is much narrower. *See Spunt v. Fowinkle,* 572 S.W.2d 259 (Tenn.App.1978), and *Ison v. McFall,* 400 S.W.2d 243, 55 Tenn.App. 326 (1964).

In contrast to the broadly interpreted practice of medicine statute, the Occupational and Physical Therapy Practice Act authorizes evaluation and treatment by a physical therapist using specific means and narrowly defined methods, provided the patient is referred by a physician [1] and further provided the therapist may not practice medicine. It should be noted the Act does not authorize a physical therapist to diagnose, to determine the cause of, or to furnish a prognosis of the future course of an injury, including its permanence. Aside from the scope of a physical therapist's practice as limited by the licensure statutes, the worker's compensation statute itself provides:

(d)(3) To provide uniformity and fairness for all parties, any medical report prepared by a *physician* furnishing medical treatment to a claimant shall use the American Medical Association Guides to the Evaluation of Permanent Impairment, (American Medical Association) or the Manual for Orthopedic Surgeons in Evaluating Permanent Physical Impair-

---

1. Because of the conflict in the language of the Act, it is uncertain whether the initial evaluation is an exception to the requirement of physician referral.

ment, (American Academy of Orthopedic Surgeons). A *physician* shall utilize the most recent edition of either publication in determining the degree of anatomical impairment. A practitioner shall be required to give an impairment rating based on one (1) of the two (2) publications noted above.

Tenn.Code Ann. § 50–6–204(d)(3) (Supp. 1991) (emphasis added). Accordingly, this statute requires a physician to use the AMA Guidelines, or the Manual for Orthopedic Surgeons in Evaluating Permanent Physical Impairment, and obviously contemplates that only physicians will be evaluating permanent physical impairment.

The legislative history of the 1988 amendments to Tenn.Code Ann. § 63–13–102(a)(9)(A) and (C) which allow for an initial physical therapy evaluation, is most instructive. Originally, the legislation proposed in the Senate allowed for direct access and treatment by physical therapists without any physician referral in all cases. The ensuing debate led to two amendments codified at Tenn.Code Ann. §§ 63–13–102(a)(9)(A) and 63–13–102(a)(9)(C). These two sections, allowing for an initial evaluation only and reiterating the prohibition of practicing medicine, grew out of the concerns of both physicians and physical therapists as expressed in extensive House and Senate committee hearings.

Prior to the 1988 amendment, physical therapists could not have any contact with the public without a physician referral. Consequently, physical therapists could not participate in health fairs, conduct general screenings in school systems, or provide preventive advice in a corporate setting. It was this initial contact with and general education of the public that the physical therapists sought. The physical therapists who testified before the legislative committees stated repeatedly they had no desire to diagnose or treat without physician referral. They readily acknowledged the greater training the physician possessed and the physical therapist's limited area of expertise. On the other hand, physicians who testified voiced their fears that the bill as initially proposed, allowing evaluation and treatment without any medical supervision, would lead to patient mismanagement. The final amendment, codified at Tenn. Code Ann. §§ 63–13–102(a)(9)(A) and 63–13–102(a)(9)(C), reflects those concerns. The Legislature wanted to ensure the access of the general public to the physical therapist for broad educational instruction and screening. No treatment, however, may be initiated without a physician referral. The further caveat regarding the practice of medicine in Tenn.Code Ann. § 63–13–102(a)(9)(C) clarifies the legislative intent to allow the physical therapist this initial contact with the general public but with physician supervision prior to any treatment.

Returning to the facts of this case, a review of the testimony of the physical therapist Lenz reveals her testimony to have exceeded the boundaries contemplated by statute. Although Lenz acknowledged in her own testimony that it is appropriate for the physical therapist to defer to a physician to determine causation and for determination of physical impairment as well as for diagnosis, she assessed permanent impairment based upon the AMA Guidelines and determined future physical restrictions for Bolton, even though none had been placed on him by any physician.

The danger in allowing Lenz's testimony to supplant that of a physician was further compounded when Dr. Hankins, a vocational rehabilitation expert, evaluated Bolton at his attorney's request. Dr. Hankins' testimony reveals that he relied heavily on the findings and recommendations of Lenz to formulate the vocational disability rating of 71 percent, a reliance we have now determined is misplaced.

We turn again to the principles that have guided us in the past in determining the extent of a physical therapist's expertise. We note that "permanency in workers' compensation cases must be established by expert medical testimony." *Johnson v. Midwesco, Inc.*, 801 S.W.2d 804 (Tenn. 1990). Consequently, when the Legislature restricted the practice of physical therapy to patients referred by a physician (with the possible exception of a first evaluation),

we believe it specifically contemplated that physical therapy is a narrow health specialty limited in scope. By allowing only physicians to use AMA Guidelines to assess permanent impairment, it recognized that the practice of medicine has a broad scope and that physicians engaged in practice may order various tests performed by others, including x-rays, MRIs and myelograms, upon which a medical judgment or diagnosis may be made. The physician then determines the mode of treatment, whether it be surgery, traction, physical therapy, prescription drugs, etc., and thereafter makes judgments of causation, prognosis, or future course, including permanence of the injury and permanent restrictions as to future physical activity.

■ Accordingly, under these statutes, we hold that a physical therapist is not qualified to form and express an expert opinion as to the permanent impairment or permanent physical restrictions of an injured person. Additionally, given the limitations inherent in the worker's compensation statutes allowing only physicians to use AMA Guidelines to assess permanent impairment, limitations imposed by the licensing statutes restricting the physical therapist's scope of practice, limitations implied by analogy through case law restricting the testimony of other health care specialists, and the legislative history of the 1988 amendment allowing physical therapists to conduct an initial evaluation without a physician's referral, we hold that a physical therapist's testimony must be limited to objective findings and cannot encompass an opinion on ultimate disability. As a result, that part of the vocational expert's opinion which was solely based on the opinions of the physical therapist as to permanency and physical restrictions was inadmissible evidence.

■ However, nothing we have said would limit a physical therapist from making future physical activity recommendations to the referring physician or a patient based on the results of tests performed within the scope of a physical therapist's licensure, nor from offering testimony thereon.

## FINDING OF PERMANENT PARTIAL DISABILITY

■ Finally, CNA contends that the preponderance of the remaining competent evidence does not support the 60 percent permanent partial disability found by the trial court.

After reviewing the competent proof in the record, we find that the evidence preponderates against the Chancellor's award of 60 percent disability. However, because this case presents an issue of first impression, the outcome of which could not have been known, we have determined that a remand is in order in fairness to all parties. Accordingly, we remand this case for further proof regarding the extent of plaintiff's permanent partial disability. The costs of this appeal are taxed equally to the appellant, CNA, and the appellee, Jerry Bolton.

REID, C.J., and DROWOTA, O'BRIEN, and DAUGHTREY, JJ., concur.