FILED

November 18, 2016

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 9:06 AM



**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**IN THE COURT OF WORKERS' COMPENSATION CLAIMS**
**AT MURFREESBORO**

| | |
|---|---|
| **JAMES HARRISON,** | **Docket No.: 2016-05-0277** |
| **Employee,** | |
| **v.** | **State File No.: 85231-2014** |
| **GENERAL MOTORS, LLC,** | |
| **Employer,** | **Judge Dale Tipps** |
| **And** | |
| **ABBIE HUDGENS,** | |
| **Administrator, Bureau of** | |
| **Workers' Compensation.** | |

---

### COMPENSATION HEARING ORDER

---

This matter came before the undersigned Workers' Compensation Judge on November 1, 2016, for a Compensation Hearing pursuant to Tennessee Code Annotated section 50-6-239 (2015). The central legal issues are: 1) whether the employee, James Harrison, is permanently and totally disabled as a result of his October 24, 2016 shoulder injury; 2) if so, what portion of the award should be apportioned to the Second Injury Fund; and 3) if he is not totally disabled, to what permanent partial disability benefits is he entitled.[1] For the reasons set forth below, the Court finds that Mr. Harrison failed to establish by a preponderance of the evidence that he is permanently and totally disabled, although he did establish a work injury primarily arising out of and in the course and scope of his employment with GM. Accordingly, the Court holds that Mr. Harrison is entitled to medical benefits and permanent partial disability benefits.

### History of Claim

The parties stipulated to the following: Mr. Harrison, a fifty-eight-year-old resident of Maury County, earned his GED in 1995, the same year he began working for Saturn Corporation. He worked for Saturn and GM through their successive corporate

---

[1] A complete listing of the technical record and exhibits admitted at the Compensation Hearing is attached to this Order as an appendix.

1

entities ever since. Mr. Harrison suffered a number of work injuries during this time, including a left shoulder injury in 2008 that resulted in a settlement for 15% vocational disability to the body as a whole, and a 2011 right wrist injury that settled for 15% disability to the right upper extremity. The injury at issue in this case occurred on October 24, 2014, when Mr. Harrison injured his right shoulder. GM accepted the injury as compensable and provided authorized medical treatment with Dr. Scott McCall.

Mr. Harrison testified he dropped out of school in the tenth grade in order to work on his family farm. He did farm work for several years before moving on to other jobs, such as operating heavy equipment, working on a river towboat, working on house construction, and working on a ship in the Gulf of Mexico. Mr. Harrison felt that he was in good physical condition when he began working at GM and had no problems with his right shoulder or wrist. During his time at GM, he worked several different production jobs. Because of his current right shoulder and wrist problems, he does not feel he could do any of those jobs today.

Mr. Harrison treated with Dr. Alton Hunter for his 2011 right wrist injury. Dr. Hunter performed surgery and returned Mr. Harrison to work with light duty restrictions of no repetitive gripping and limited use of power tools. Mr. Harrison provided this information to GM, which provided work within his restrictions. Mr. Harrison returned to Dr. Hunter periodically for follow-up and would provide Dr. Hunter's current restrictions to GM. If Mr. Harrison's job assignment complied with those restrictions, GM would keep him on that job. If it did not, GM reassigned him to an appropriate job.

When Dr. Hunter last saw Mr. Harrison for his wrist in October 2012, Mr. Harrison was working at a "caregate" or inspection job that did not violate any of his restrictions. At that time, Dr. Hunter placed Mr. Harrison at maximum medical improvement (MMI) and told him to return in six months. Mr. Hunter continued to perform the caregate job for another six to eight months before GM transferred him to a "moist sanding" job in the paint department. He did not return to Dr. Hunter because he was able to perform his job and the return appointment slipped his mind.

While performing the moist sanding job, Mr. Harrison injured his right shoulder on October 24, 2014. Because Dr. Hunter no longer treated shoulders, Mr. Harrison began treating with Dr. McCall, who performed surgery. During the course of his follow-up treatment, Dr. McCall ordered a functional capacity evaluation (FCE). After discussing the FCE results with Dr. McCall, Mr. Harrison took his new restrictions back to GM, which had no jobs he could perform within those restrictions. Mr. Harrison has not worked for any employer or earned any income since his October 2014 shoulder injury.

When asked about his present condition, Mr. Harrison described current, ongoing pain in both his right wrist and his right shoulder. He also demonstrated to the Court a

significantly restricted range of motion in his shoulder and his wrist. He testified he takes OxyContin two to three times per day for his pain. When asked if he could still work, he said he would have to see what the job duties were before he could make that determination, but he did not think he could be retrained.

On cross-examination, Mr. Harrison testified that his right wrist restrictions would have prevented him from performing over 90% of the jobs at GM. He also has a pacemaker that prevents him from working around magnetic fields, and GM knew about that restriction. He confirmed that he is able to perform activities of daily living, such as driving, bathing, cooking, and dressing himself. He is still recovering from a recent, non-work-related hip replacement surgery.

Mr. Harrison testified he has not applied for any job or other work because he still has a job at GM. He currently receives disability benefits from GM. He has not sought any government assistance or information regarding training for other kinds of work. He agreed there are jobs he could do as long as they do not involve any significant lifting.

The parties introduced a number of exhibits into evidence during the hearing, including some of Dr. Hunter's chart notes. These notes show that Dr. Hunter treated Mr. Harrison for osteoarthritis of the right wrist and performed a proximal row carpectomy in February 2012. The note of July 20, 2012, indicates Dr. Hunter assigned light duty for three months with "no air guns, no repetitive gripping." On October 22, 2012, Dr. Hunter assigned a twelve percent right arm impairment and stated, "He will return in six months to assess the need for any permanent restrictions." (Ex. 14.)

GM Medical Records Reports related to Mr. Harrison's 2012 right wrist injury show that GM's clinic physician, Dr. Daniels, reviewed Dr. Hunter's treatment records and made his own notations regarding Mr. Harrison's medical status. The first note documented Mr. Harrison's return to work on June 11, 2012, with restrictions of limited forceful gripping/grasping with the right hand and indicated these restrictions were to remain in place for three months. The September 13, 2012 report renewed those restrictions for another two months. On November 15, 2012, the same restrictions were renewed for six months, but Dr. Daniels indicated they were "probably permanent." Dr. Daniels then indicated on May 15, 2012, that the same restrictions "should remain in place through 10/29/2013." The last record shows that that Mr. Harrison failed to attend his October 30, 2013 appointment with Dr. Hunter. (Ex. 5.)

Records from Dr. McCall show he treated Mr. Harrison for a labral tear, synovitis, and bursitis of the right shoulder, resulting in a 3% permanent impairment. The October 19, 2015 note states: "I reviewed the FCE which suggested sedentary work. From his shoulder issue, he is at MMI and will be released based on the FCE findings." (Ex. 7.)

The FCE (functional capacity evaluation) to which Dr. McCall referred was

3

performed on September 28, 2015, at Star Physical Therapy by Josh Ezell, ATC/L,[2] and Alicia Benham, DPT.[3]  The FCE report shows that Mr. Harrison made acceptable/good effort, and the evaluators considered the data from the evaluation to be reliable.  They concluded:

> The patient demonstrated the ability to function at the SEDENTARY physical demand level (based on lifting) as defined by the U. S. Department of Labor's "Dictionary of Occupational Titles."  The patient demonstrated the following maximum, OCCASIONAL lifts with use of the right shoulder/upper extremity:
>    *Floor to waist – 10 lbs.
>    *Waist to shoulder – 6 lbs.
>    *Shoulder to overhead – 2.5 lbs.
>    *Carry – 10 lbs.
>    *Unitlateral Carry RUE – 5 lbs.
>    *Lifting out from Body – 2.6 lbs.
>    *Unilateral Lift, Carry & Maneuver LUE – 35 lbs.
>    *Push/pull force – 36 & 29 lbs. respectively.

(Ex. 6.)

Dr. McCall completed a C-32 Standard Form medical report on August 16, 2016, in which he restated his 3% impairment rating and related that impairment to the October 2014 right shoulder injury.  In section G, the Functional Capacity Assessment, Dr. McCall imposed maximum and frequent lifting restrictions of ten pounds, lift and carry restrictions of ten pounds less than three hours, and push/pull limitations of "36 & 29 lbs. per FCE."  He checked the "limited" box for reaching, noting this was for the right arm only, but indicated Mr. Harrison was "unlimited" in the other physical factors, such as handing and fingering.  He also wrote on this part of the form, "More detail in FCE." (Ex. 11.)

In his deposition, Dr. McCall testified he surgically repaired Mr. Harrison's biceps tear and cleaned up some inflammation.  He felt Mr. Harrison's smoking and hepatitis C complicated and prolonged his recovery, but Mr. Harrison reached MMI on October 19, 2015, with a 3% whole person rating.  (Ex. 16.)  When asked what Mr. Harrison's restrictions were, Dr. McCall stated:

> Based off the Functional Capacity Evaluation, to the right upper extremity we had . . . waist to floor lifting of 10 pounds; waist to shoulder of 5 pounds; shoulder to overhead of two-and-a-half pounds; carry, 10 pounds;

---

[2] Certified/licensed athletic trainer.
[3] Doctor of physical therapy.

4

unilateral carry in the right upper extremity of 5 pounds; lifting out from body of two-and-a-half pounds; unilateral carry – lift, carry and maneuver, left upper extremity, 35 pounds; push/pull, 36 and 29 pounds respectively.

He confirmed he gave no restrictions for the left arm or any other restrictions. Dr. McCall also stated he was not assigning a restriction limiting Mr. Harrison to the sedentary job classification. *Id.* at 21-23.

Dr. McCall further testified that he felt Mr. Harrison could work and that it would be good for him. He suggested Mr. Harrison could do jobs "where his workload is at or below shoulder level" or "any type of work where you're not having to do heavy lifting." *Id.* at 25-26.

On cross-examination, Dr. McCall explained that he did not restrict Mr. Harrison to sedentary work, but the shoulder restrictions he assigned Mr. Harrison put him in the category of sedentary work according to the U.S. Department of Labor. *Id.* at 45-46. He also agreed that Mr. Harrison would experience limitations with activities such as "continuous and sustained reaching overhead" and weakness grip strength, even though the doctor had not given a formal restriction for these activities. *Id.* at 51-52.

Although Dr. Hunter provided no testimony, Mr. Harrison submitted a Physician's Form[4] completed by Dr. Hunter for Mr. Harrison's Application for GM Disability Benefits. In response to the question, "Is the patient able to engage in any occupation or employment for wage or profit?" Dr. Hunter wrote "No," and attributed the causes of Mr. Harrison's disability as "R hand/shld injury." (Ex. 15.)

Mr. Harrison's vocational expert, Dana Stoller, testified that she performed a vocational assessment of Mr. Harrison on February 18, 2016. She evaluated Mr. Harrison's work history and concluded he did not have any transferable job skills for less physically demanding jobs. His relevant work history, which Ms. Stoller defined as the last fifteen years, included no skilled work experience. She characterized his most recent work as a wet sander as semi-skilled.

Ms. Stoller based her conclusions on her review of Mr. Harrison's medical records, Dr. McCall's deposition transcript, and her interview and testing of Mr. Harrison. She explained that she relied in part on Dr. Hunter's restrictions of no repetitive gripping and no vibratory tools, as well as limitations related to the prior wrist injury outlined the FCE. She noted the FCE was more limiting and restricting than Dr. Hunter's restrictions. Ms. Stoller testified she relied upon the entirety of the FCE in determining Mr. Harrison's permanent restrictions and limitations.

---

[4] This form was admitted over objection as a business record.

Ms. Stoller testified that the FCE defines Mr. Harrison's physical demand category as "sedentary" based on lifting. She disagreed with this conclusion because it only applied to one extremity, rather than taking the whole individual into consideration. She testified his maximum physical demand category should be "less than sedentary" because of other limitations in material handling reflected in the FCE. She went on to say there are no job opportunities for Mr. Harrison in the less than sedentary category because all less than sedentary jobs require the use of more than one arm. Based on her conclusion that Mr. Harrison would be limited to unskilled, sedentary work, Ms. Stoller testified he would normally be qualified for 137 job titles. However, taking into consideration the limitations set out in the FCE, she could not conceive of any job Mr. Harrison could currently perform. When asked whether Mr. Harrison could perform any jobs based solely on the restrictions assigned by Dr. McCall, Ms. Stoller explained that she would still have to consider other factors, such as Mr. Harrison's age, education, skills, and pain medication use. She concluded by stating her opinion that Mr. Harrison is 100% totally incapacitated from gainful employment.

On cross-examination, Ms. Stoller acknowledged she provided her opinion and issued her report before Dr. McCall gave his deposition. She agreed she based her opinion on the FCE and not on Dr. McCall's testimony. She acknowledged adding restrictions to those given by Dr. McCall, which resulted in her placing Mr. Harrison in the less than sedentary work category. Her opinion, if using just Dr. McCall's restrictions, is that Mr. Harrison would be in the sedentary category and his vocational loss would be 98 or 99%. While Ms. Stoller admitted she had no medical training that would qualify her to assess the appropriate restrictions for Mr. Harrison, she stated the physical therapists who performed the FCE were "trained and qualified to provide limitations and assessments."

GM's vocational expert, Patsy Bramlett, performed a vocational assessment of Mr. Harrison, which included review of his medical records and the deposition transcripts of Mr. Harrison, Dr. McCall, and Ms. Stoller, as well as her own in-person testing and evaluation. She testified that medical restrictions "bridge the gap between the medical field and the vocational field." She reviewed the restrictions adopted by Dr. McCall and opined he would be able to perform some, but not all, of the jobs classified as "light." Based on this "limited light work" classification, she felt that his vocational disability would be 75%. If she factored in additional limitations on tasks requiring motor coordination, finger dexterity, and manual dexterity, she estimated vocational disability of 85%. She also testified that Mr. Harrison's most recent job could be categorized as semi-skilled. As a result, she felt he might have additional transferrable skills.

Ms. Bramlett disagreed with Ms. Stoller's "less than sedentary" classification because it was based on a number of additional physical limitations without crediting that Mr. Harrison retains an unimpaired left arm. Unlike Ms. Stoller, Ms. Bramlett considered the lack of restrictions on Mr. Harrison's left arm in evaluating his vocational

6

prospects. That is, because he could lift and work with his left arm, his overall vocational prospects were improved. She did not think Mr. Harrison was totally disabled, and she identified a number of available jobs in his area that she felt he would be able to perform.[5] She also testified that her evaluation and analysis did not include consideration of the possibility of part-time work or self-employment.

On cross-examination, Ms. Bramlett was asked about the GM Clinic note that suggested Dr. Hunter's restrictions would probably be permanent. She testified she did not consider any GM Clinic notes in forming her opinion, but admitted that, were she to take additional restrictions from Dr. Hunter into consideration, her vocational disability opinion might be different. She also acknowledged that prejudice against people with disabilities could be a negative employability factor, as could an employee's age.

Ms. Bramlett was also asked about the appropriateness of including Mr. Harrison's left arm functionality in her analysis. She justified this by stating that her methodology for dealing with unilateral extremity impairment is peer-reviewed and is the approach used by other vocational experts.

At the Compensation Hearing, Mr. Harrison asserted he is entitled to permanent total disability (PTD) benefits for his shoulder injury arising primarily out of and in the course and scope of his employment. He relied on Ms. Stoller's opinion that he has no vocational opportunities in his current physical state. He disagreed with Ms. Bramlett's opinion because she only considered Dr. McCall's right shoulder restrictions, and he argued she should have taken Dr. Hunter's restrictions and the full FCE into account. He also contended it is unreasonable to assume a fifty-eight-year-old man with a GED could successfully retrain for jobs outside his current abilities. He further argued that his current condition is the only relevant inquiry and that the Court should not even consider the question of retraining.

GM countered that Mr. Harrison is not entitled to PTD benefits because he has not met his burden of proving he is unable to work at any job. It relied on Ms. Bramlett's opinion that Mr. Harrison's total job loss was 75 to 85%. GM argued that her opinion is valid because she based it on Dr. McCall's restrictions, which are the only medical restrictions in evidence. It also argued that, because all the restrictions are to the right arm, it is improper to consider the additional limitations (such as bending, squatting, or kneeling) contained in the FCE.

GM also contended that Ms. Stoller's "taking the whole person into account" really means she selectively applied restrictions from the FCE in order to place Mr. Harrison in a less than sedentary job category. It argued that, in fact, she did not consider

---

[5] Even if the temporary gripping and power tool restrictions from Dr. Hunter were permanent, Ms. Bramlett believed Mr. Harrison would still retain vocational opportunities because of his remaining left arm functionality.

the whole person because she ignored the fact that Mr. Harrison has a functional left arm. It suggested that adopting Ms. Stoller's approach would mean that anyone who loses an arm would be totally disabled.

The Second Injury Fund questioned the efficacy of the FCE, arguing that Mr. Harrison had not fully recovered from his extended bout of hepatitis C symptoms and treatment before participating in it. It argued Mr. Harrison's actual functional capabilities are substantially higher than his FCE results.[6]

## Findings of Fact and Conclusions of Law

The following legal principles govern this case. Mr. Harrison has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, No. 2014-05-0005, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Tenn. Workers' Comp. App. Bd. Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2015) ("[T]he employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence."). In analyzing whether Mr. Harrison has met his burden, the Court will not construe the law remedially or liberally in his favor, but instead must construe the law fairly, impartially, and in accordance with basic principles of statutory construction favoring neither Mr. Harrison nor GM. *See* Tenn. Code Ann. § 50-6-116 (2015).

## *Permanent Total Disability*

The primary issue in this case is whether Mr. Harrison has met his burden of proving he is entitled to PTD benefits. Tennessee Code Annotated section 50-6-207(4)(B) (2014) provides: "When an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled[.]" The assessment of permanent total disability is based upon numerous factors, including the employee's skills and training, education, age, local job opportunities, and his capacity to work at the kinds of employment available in his disabled condition. *Roberson v. Loretto Casket Co.*, 722 S.W.2d 380, 384 (Tenn. 1986). Although a rating of anatomical disability by a medical expert is also one of the relevant factors, "the vocational disability

---

[6] GM and the Second Injury Fund also questioned whether Mr. Harrison's right arm symptoms are as severe as he claims, whether he actually possessed more vocational skills and experience than he reported to the vocational experts, and whether he has an incentive not to look for work because of his current employment status and ongoing benefits with GM.

is not restricted to the precise estimate of anatomical disability made by a medical witness." *Henson v. City of Lawrenceburg*, 851 S.W.2d 809, 812 (Tenn. 1993) (citing *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 458 (Tenn. 1988)). In addition, the employee's "own assessment of [his] physical condition and resulting disability is competent testimony that should be considered[.]" *McIlvain v. Russell Stover Candies, Inc.*, 996 S.W.2d 179, 183 (Tenn. 1999).

With regard to this last factor, the Court notes that Mr. Harrison did not testify that he was totally disabled. Rather, he stated he would have to know the duties of any potential job before he could make that determination. He felt there are jobs he could do as long as they do not involve any significant lifting. The Court finds that Mr. Harrison's testimony demonstrates a willingness to try to work, but it is not determinative on the question of whether he actually has any potential vocational opportunities.

Similarly, the Court does not consider the physicians' opinions to be determinative. Because the parties had no opportunity to depose Dr. Hunter about the facts underlying his conclusion,[7] his competence on issues of disability, or his understanding of Mr. Harrison's work history or abilities, Dr. Hunter's one-word response on a form not associated with Mr. Harrison's workers' compensation claim lacks any foundation or context. The Court can afford it no weight. Dr. McCall's general statement that Mr. Harrison can work is only marginally more helpful, as he was unable to demonstrate any knowledge of the physical requirements of any specific jobs or the availability of those jobs. The Court therefore finds its primary guidance on this issue in the testimony of the vocational experts.

Both experts were qualified and provided a great deal of testimony about their methodology, such as detailed explanations of the various work categories. The Court has not summarized that testimony in detail, but considered it carefully. Both Ms. Stoller and Ms. Bramlett generally agreed on Mr. Harrison's basic academic abilities: his math skills were comparable to a middle school grade level, and that his reading skills were equivalent to or higher than twelfth grade. They also agreed that, prior to his 2011 wrist injury, he retained no restrictions from his prior work injuries. The divergence in their opinions results primarily from the restrictions upon which they based their evaluation. Ms. Bramlett limited her analysis to the permanent restrictions imposed by Dr. McCall. Ms. Stoller included all the restrictions in the FCE, as well as Dr. Hunter's prior restrictions of no repetitive gripping and no vibratory tools.

The undisputed proof shows that Dr. McCall assigned permanent restrictions of "waist to floor lifting of 10 pounds; waist to shoulder of 5 pounds; shoulder to overhead of two-and-a-half pounds; carry, 10 pounds; unilateral carry in the right upper extremity

---

[7] Mr. Harrison's counsel was not aware of this document until October 19, 2016, and disclosed it to opposing counsel on October 20, just over a week before the hearing.

of 5 pounds; lifting out from body of two-and-a-half pounds; unilateral carry – lift, carry and maneuver, left upper extremity, 35 pounds; push/pull, 36 and 29 pounds respectively." The question for the Court is whether Mr. Harrison retains any other permanent restrictions, either assigned by Dr. Hunter or found in the FCE.

Regarding Dr. Hunter, the Court finds no proof that he ever assigned any permanent restrictions. The only medical records submitted as evidence characterize Mr. Harrison's right wrist restrictions as temporary, and he never returned to Dr. Hunter for his October 2013 appointment to determine his permanent restrictions. Mr. Harrison essentially asks the Court to assume that Dr. Hunter would have made the temporary restrictions permanent at that time. The Court is not qualified to make such a medical determination on its own and is unable to speculate as to what Dr. Hunter might have done. The Court therefore finds that Mr. Harrison has not met his burden of proving the existence of any permanent right wrist restrictions from Dr. Hunter by a preponderance of the evidence.

Turning to the restrictions contained in the FCE, the Court first notes: "a physical therapist is not qualified to form and express an expert opinion as to the permanent impairment or permanent physical restrictions of an injured person." *Seal v. Charles Blalock & Sons, Inc.*, 90 S.W.3d 609, 613 (Tenn. 2002) (citing *Bolton v. CNA Ins. Co.*, 821 S.W.2d 932, 938 (Tenn. 1991)). This raises the question of whether, if the physical therapists that performed Mr. Harrison's FCE are not qualified to express an expert opinion as to his permanent restrictions, could Ms. Stoller properly base her conclusions on their recommended restrictions? Based on the holding in *Bolton*, it would appear she could not. Once the *Bolton* court determined that a physical therapist is limited to expressing objective findings, it held "that part of the vocational expert's opinion which was solely based on the [therapist's] opinions as to permanency and physical restrictions was inadmissible evidence." *Id.* at 938. As in *Bolton*, the Court finds the restrictions contained in Mr. Harrison's FCE are an improper foundation for a vocational opinion because no physician assigned them.[8] Ms. Stoller explained she felt the FCE was more precise than Dr. McCall's testimony but under *Bolton*, she cannot substitute the FCE measurements for the only medical opinion of permanent restrictions. To the extent Ms. Stoller's opinion is based on non-physician restrictions, that opinion is either inadmissible or given no weight.

This leaves the Court with only the right shoulder restrictions adopted by Dr. McCall. Ms. Bramlett testified that, under these restrictions, Mr. Harrison's vocational disability would be 75 to 85%. Ms. Stoller testified that if she were to use only Dr. McCall's restrictions, Mr. Harrison would be in the sedentary category of jobs and his vocational loss would be slightly less than 100%.

---

[8] Mr. Harrison did not contend that Ms. Stoller was qualified to assign restrictions herself and, in fact, she testified that she had no medical training that would qualify her to assess the appropriate restrictions for Mr. Harrison.

The Court is cognizant of the fact that Mr. Harrison has suffered a significant vocational disability. It also recognizes that, under current law, there is no middle ground between a permanent partial disability award of 3% and an award of PTD benefits. However, Mr. Harrison's burden of proof includes establishing permanent total disability, and asking the Court to speculate as to the existence of permanent restrictions is insufficient to meet that burden. The Court, therefore, cannot find Mr. Harrison is permanently and totally disabled.

Mr. Harrison argued that Dr. McCall effectively adopted the additional permanent restrictions in the FCE. The Court disagrees. Dr. McCall agreed on cross-examination that Mr. Harrison would experience limitations with certain activities. However, construing this as a medical restriction would be speculative, especially in light of his explicit testimony that he was assigning no restrictions for anything other than the right shoulder injury and that he was not limiting Mr. Harrison to the sedentary job classification.

Even if the Court were to accept the foundation of Ms. Stoller's opinion, it would still have to resolve the discrepancy between the two experts' methodologies. While neither expert provided explicit authority on the issue of whether Mr. Harrison's residual left arm capability should be considered, the Court finds Ms. Bramlett's explanation to be more persuasive. The Court finds it appropriate to consider the lack of restrictions on Mr. Harrison's left arm in evaluating his vocational prospects and credits Ms. Bramlett's opinion that his overall vocational prospects are improved because he can lift and work with his left arm.

*Permanent Partial Disability*

For post-July 1, 2014 injuries, permanent partial disability is paid at sixty-six and two-thirds percent of the injured employee's average weekly wage for the period of compensation as determined by multiplying the employee's impairment rating by 450 weeks. Tenn. Code Ann. § 506-207(3)(A) (2015). In this case, Mr. Harrison's impairment rating is 3% to the body, giving him a period of compensation of 13.5 weeks. His stipulated compensation rate is $848.00. Therefore, the Court finds his "original award" is $11,448.00.

Tennessee Code Annotated section 50-6-207(3)(B) (2015) provides:

If at the time the period of compensation provided by subdivision (3)(A) ends the employee has not returned to work with any employer or has returned to work and is receiving wages or a salary that is less than one hundred percent (100%) of the wages or salary the employee received from the employee's pre-injury employer on the date of injury, the injured

11

employee may file a claim for increased benefits. If appropriate, the injured employee's original award as determined under subdivision (3)(A) shall be increased by multiplying the original award by a factor of one and thirty-five one hundredths (1.35). The award set out in this subdivision (3)(B) shall be referred to as the "resulting award." In addition, the injured employee's resulting award shall be further increased by multiplying the resulting award by the product of the following factors, if applicable:

(i) Education: one and forty-five one hundredths (1.45), if the employee lacks a high school diploma or general equivalency diploma;

(ii) Age: one and two tenths (1.2), if the employee was more than forty (40) years of age at the time the period of compensation ends.

(iii) Unemployment rate: one and three tenths (1.3), if the unemployment rate, in the Tennessee county where the employee was employed by the employer on the date of the workers' compensation injury, was at least two (2) percentage points greater than the yearly average unemployment rate in Tennessee according to the yearly average unemployment rate compiled by the department for the year immediately prior to the expiration of the period of compensation.

The parties stipulated that Mr. Harrison remained an employee of GM at the time of the hearing. However, Mr. Harrison testified that he only receives disability payments from GM that are substantially less than his regular pay at the time of his injury. This appears to also have been true at the end of the initial compensation period. Thus, the Court holds two of the additional factors shown above are applicable. Mr. Harrison is entitled to an additional $4,006.80 because of his failure to return to work at his pre-injury wages, as well as an additional $3,090.96 because he was more than forty years old when the compensation period ended.

**IT IS, THEREFORE, ORDERED** as follows:

1. GM who shall continue to provide Mr. Harrison with medical treatment made reasonably necessary by the October 27, 2014 injury and in accordance with Tennessee Code Annotated section 50-6-204 (2015). Dr. McCall shall be designated the authorized treating physician for any future care.

2. GM shall pay Mr. Harrison permanent partial disability benefits of $18,545.76 in a lump sum.

3. The Court further finds Mr. Harrison's counsel, Anthony Arena, provided good and valuable services to Mr. Harrison in pursuit of his claim and is therefore entitled to recover a fee of twenty percent of his permanent disability award pursuant to Tennessee Code Annotated section 50-6-226 (2015).

4. Costs of this cause of $150.00 are assessed against GM pursuant to Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2015), to be paid within five days of this order becoming final.

5. GM shall prepare and file a statistical data form within ten business days of the date of this order, pursuant to Tennessee Code Annotated section 50-6-244 (2015).

6. After a Compensation Hearing Order entered by a Workers' Compensation Judge has become final in accordance with Tennessee Code Annotated section 50-6-239(c)(7) (2015), compliance with this Order must occur in accordance with Tennessee Code Annotated section 50-6-239(c)(9) (2015). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the fifth business day after this Order becomes final or all appeals are exhausted. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

**ENTERED this the 18th day of November, 2016.**

_____

**Dale Tipps**
**Workers' Compensation Judge**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Compensation Hearing Order to appeal the decision to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal your case to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within thirty calendar days* of the date the Workers' Compensation Judge entered the Compensation Hearing Order.

3. Serve a copy of the Compensation Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment

must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The party filing the notice of appeal, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. Alternatively, the party filing the appeal may file a joint statement of the evidence within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board. *See* Tenn. Comp. R. & Regs. 0800-02-22-.03 (2015).

6. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Workers' Compensation Appeals Board, the appeal will be docketed and assigned to an Appeals Board Judge for review. At that time, a docketing notice shall be sent to the parties. Thereafter, the parties have fifteen calendar days to submit briefs to the Appeals Board for consideration. *See* Tenn. Comp. R. & Regs. 0800-02-22-.02(3) (2015).

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, this Order will become final by operation of law thirty calendar days after entry pursuant to Tennessee Code Annotated section 50-6-239(c)(7).**

14

## APPENDIX

Technical record:

1. Petition for Benefit Determination
2. Post-Discovery Dispute Certification Notice
3. Mr. Harrison's Pre-Hearing Statement
4. GM's Pre-Hearing Brief
5. Second Injury Fund's Brief
6. Pre-Compensation Hearing Statement
7. GM's Witness and Exhibit List
8. Mr. Harrison's Exhibit List
9. Second Injury Fund's Witness and Exhibit List
10. Agreed Exhibit List
11. Pre-Hearing Order

The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

Exhibits:

1. Maury Regional Admission Assessment
2. Maury Regional Report of Consultation
3. GM Medical Records Report 1-28-16
4. MTB&J Chart Note 7-20-12
5. GM Medical Records Report 2-18-16
6. Functional Capacity Evaluation
7. MTB&J Chart Note 10-19-15
8. MTB&J Chart Note 10-22-12
9. Maury Regional Physical Therapy Re-Evaluation
10. MTB&J Post Op Visit 8-11-16
11. C-32 Standard Form Medical Report – Dr. McCall
12. Vocational Assessment Report of Ms. Bramlett
13. Restrictions Questionnaire for Transferred Employees
14. Employee's medical records – collective
15. GM Benefits Application
16. Deposition Transcript of Dr. McCall
17. Deposition Transcript of Mr. Harrison
18. January 7, 2013 settlement documents
19. February 25, 2010 settlement documents
20. August 3, 2011 settlement documents

21. CV of Dana Stoller
22. DOT Occupational Descriptions (Identification Only)
23. Vocational Report of Ms. Stoller
24. GM Benefits Application with affidavit of custodian

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 18th day of November, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| J. Anthony Arena, Employee's Attorney | | | X | tony@arenalawfirm.com |
| Jason A. Lee, Employer's Attorney | | | X | jlee@burrowlee.com |
| Ronald W. McNutt, SIF Attorney | | | X | ronald.mcnutt@tn.gov |

_____

**PENNY SHRUM, COURT CLERK**
wc.courtclerk@tn.gov

17